**CALFON CONSTRUCTION INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 792–87C.**

United States Claims Court.

Oct. 18, 1989.

Paul M. Mahoney, Pomona, Cal., for plaintiff.

Theodore R. Carter, III, Washington, D.C., with whom was Acting Asst. Atty. Gen. Stuart E. Schiffer, for defendant.

## OPINION

NETTESHEIM, Judge.

This contract case is before the court after trial. Each party has submitted a post-trial brief on the legal significance of plaintiff's failure to supply written notice to the contracting officer of orders that it regarded to be constructive changes to the contract.

## FACTS

The facts of this case were discussed in an earlier order denying defendant's motion for summary judgment. *See Calfon Constr. Inc. v. United States,* 17 Cl.Ct. 171 (1989). The facts outlined on summary judgment are revisited below to the extent necessary.

On September 30, 1983, Calfon Construction Inc. ("plaintiff") was awarded fixed-price contract No. N62474–83–C–2349 calling for concrete paving of the Hangar 300 aircraft apron located at the Naval Air Station in Fallon, Nevada ("Fallon"). The Invitation for Bids issued on August 19, 1983, contained the following Description of Work:

> The work includes the furnishing of all labor, materials and equipment for demolition and removal, earthwork, storm drainage system, portland cement earthwork, storm drainage system, portland cement stabilized base course, asphalt concrete pavement, portland cement concrete pavement, cast-in-place concrete, joints, reinforcement and mooring eyes in concrete pavements, resealing in rigid pavements, pavement markings, concrete repairs, metal work, air start compressed air system, underground electrical work, airfield lighting, cathodic protection and incidental related work.

The contract price was $2,599,280.00. At trial plaintiff's President Vincent S. DeBellis testified as to the scope and order of the contract work:

> We had to remove the existing concrete in some areas and we had to remove the concrete underneath the existing aprons in configurations that would allow us to put in the air-start system [for starting naval aircraft] and the storm drain system, then backfill that, test the lines, backfill them, then go and put a one-inch bond breaker down, put some base course down in other areas that the concrete didn't overlay the existing concrete, and put in a base course there, and then lay down the eight-inch overlay [of portland cement concrete].

The contract drawings reflected a grading plan, finished elevations, and the typical overlay for the Hangar 300 apron. Drawing C–4 contained the finished elevation and contour grades to be met by the contract. Drawing C–13 depicted a typical finished concrete section showing an eight-inch portland cement concrete ("PCC") overlay.

Plaintiff proceeded to perform the contract in conformance with the contract specifications. A one-inch A.C. bond breaker was installed over the entire apron as called for by the plans and specifications. Subsequent to the installation of the A.C. bond breaker and prior to commencing work on the PCC overlay, rain ensued. Plaintiff discovered that puddling had developed on the one-inch A.C. bond breaker. Plaintiff viewed the puddling and poor drainage as unsatisfactory. If plaintiff poured the PCC overlay to conform to the A.C. bond breaker, the same pattern of puddling would occur on the finished surface.

The General Provisions of the contract included paragraph 62(a), the contractor's "Warranty of Construction:"

> In addition to any other warranties set out elsewhere in this contract, *the Contractor warrants that work performed under this contract conforms to the contract requirements and is free of any defect of equipment, material or design furnished, or workmanship performed by the Contractor or any of his*

*subcontractors or suppliers at any tier.* Such warranty shall continue for a period of one year from the date of final acceptance of the work, but with respect to any part of the work which the Government takes possession of prior to final acceptance, such warranty shall continue for a period of one year from the date the Government takes possession. Under this warranty, the Contractor shall remedy at his own expense any such failure to conform or any such defect. . . .

(Emphasis added.) Paragraph 62(f) identifies the situation where the defect is not the fault of the contractor or subcontractor:

Notwithstanding any other provision of this clause, unless such a defect is caused by the negligence of the Contractor or his subcontractors or suppliers at any tier, the Contractor shall not be liable for the repair of any defects of material or *design furnished by the Government,* nor for the repair of any damage which results from any such defect in Government furnished material or design.

(Emphasis added.)

Drawing C–4 detailed the development of required drainage patterns across the entire apron. Drawing C–13 is what engineers refer to as a "bubble"; the contents of the bubble reference details found in other drawings. Drawing C–13 stated that the "typical" cross-section of concrete would be eight inches thick over the entire PCC overlay, as shown in Drawing C–4. Drawing C–4 displays a variation in contour elevations from 33.0 to 36.5 degrees. In order to create drainage lines, the elevations fluctuated from increases in elevation followed by decreases within the contour lines; however, the drawings did not afford much detail. The evidence supports an inference that both parties expected that an eight-inch overlay of PCC was required throughout.

Prior to commencing work on the concrete overlay, plaintiff's quality control representative Murray E. Morin noticed a variety of related problems. Mr. Morin believed that if plaintiff installed a uniform eight-inch overlay across the entire apron, consistent with Drawing C–13, the cement apron would cover some of the electrical vaults that had been installed, would not adjoin properly with adjacent lanes and aprons (the "KDH taxiway" and the "Brutoco apron"), and would not provide sufficient drainage. Plaintiff complained in July of 1985, and the Navy would later agree, that a discrepancy existed between contract Drawings C–4 and C–13. Laying down a straight eight-inch overlay would not work; alternative solutions were required.

On August 26, 1985, prior to plaintiff's planned commencement date of mid-September and in response to Mr. Morin's having alerted him to the problem with lack of correlation between the pavement elevations and the electrical vaults, Lt. Stephen J. Markey, Assistant Resident Officer in Charge of Construction ("ROICC"), estimated the increase in costs to the Navy if plaintiff were directed to follow the contours of Drawing C–4. Lt. Markey, who had been the contracting officer since March of that year, directed Navy surveyors from Fallon to gather data on apron elevations. From the survey data collected, Lt. Markey predicted that the overrun would be approximately $100,000.00. To verify his estimates, he requested that his superiors at the Western Division, Naval Facilities Engineering Command ("WESTDIV"), immediately requisition a new survey of the apron to be conducted within ten days. In a letter dated August 26, 1985, Lt. Markey wrote:

2. The preliminary survey data from Public Works, NAS Fallon, and the Contractor indicates the elevations of the existing Hanger # 300 pavement do not correlate with the finished elevations on page C–4 of the subject contract plans.

3. The contractor currently plans to start paving in mid-September. If he places concrete to meet the elevations indicated on page C–4 of the subject plans, it is estimated that an additional $55,000.00 of concrete will be required, resulting in a total change estimated at $100,000.00.

4. In order to determine accurately the elevation of the existing Hanger # 300 pavement in all locations, it is required that WESTDIV conduct a grid survey of the area within the next ten days. This information is essential in order to evaluate alternatives to minimize cost and obtain an acceptable product.

Lt. Markey was prescient in his August 1985 projection of costs, since plaintiff's claim, not contested as to amount, was $95,982.86.

In order to solve the problem of the overlay's covering electrical vaults A–8, A–9, and A–10, Lt. Markey orally directed plaintiff on August 29, 1985, to raise the level of the electrical vaults so that they would be flush with the new cement pavement. Formal direction to raise the vaults and thereby call for an eight-inch pavement above the one-inch bond breaker was confirmed by letter of September 4, 1985. At that point Lt. Markey had not received the results of the survey he requested. Solving the problems as to adjoining the neighboring lanes and effecting proper drainage, however, would require greater investigation and discussion.

The aircraft apron was designed to host jet aircraft from Carrier Air Groups participating in flight exercises at Fallon Air Base. From the Navy's perspective, the strength of the apron concrete was critical. Thick concrete is sturdier under the weight of jet aircraft and is less likely to crack, or "spall," over the life the apron. An apron that "spalls" can be a hazard to Navy aircraft and missions. Pieces of cement and rock that splinter from the apron can be sucked into the engines of jet aircraft as the jets prepare for takeoff, causing damage. The phenomenon, known as "FOD," or foreign object damage, would prove to be significant in terms of joining plaintiff's apron to the adjacent lanes, and again later, with respect to the apron's drainage patterns.

The Brutoco apron adjacent to plaintiff's project, constructed under contract with Brutoco Engineering & Construction, Inc. ("Brutoco"), plaintiff's paving subcontractor on the instant contract, was found to be approximately one-inch lower than the planned elevation of plaintiff's apron. The KDH taxiway to the north of the airfield, constructed by KDH Inc., was found in late September 1985 to be approximately two inches higher than plaintiff's apron. The Navy had essentially two options. It could either direct plaintiff to pave an eight-inch overlay (except that near the KDH taxiway plaintiff would pave nine inches and near the Brutoco apron it would pave seven inches), or, it could direct the contractor to pave to the C–4 contours throughout.

There were obstacles with each method of performance. There was concern that if the Navy directed plaintiff to pave to a seven-inch concrete thickness where plaintiff's project met the Brutoco apron, the concrete would spall and crack under the weight of the aircraft. Paving to the contours throughout the project, on the other hand, would amount to a large overrun in concrete. Lt. Markey's authority as Assistant ROICC included approval of changes in amounts less than $50,000.00. For amounts beyond $50,000.00, Lt. Markey would convene a board to review the change, upon which he would serve as the senior panel member.

To avoid an overrun, Lt. Markey directed T. Lance Dutton, a Navy civil engineer and recent addition to the Assistant ROICC's staff, to conduct a strength analysis of a seven-inch apron. Mr. Dutton later reported that a seven-inch concrete thickness at the point where the two aprons met would not crack or spall under the weight of bomber and fighter aircrafts. The analysis would later be used by Lt. Markey and Mr. Dutton to convince their Navy superiors at WESTDIV that the Navy "could live with" a seven-inch overlay at the point where plaintiff's project met the Brutoco apron.

After plaintiff's subcontractor Granite Construction put down the one-inch asphalt bond breaker, the Navy's construction representative Patrick M. Callahan recalled seeing "considerable puddling." According to Mr. Callahan, Mr. Morin, plaintiff's quality control representative; Ronald E. Sweet, plaintiff's grade foreman; and Mr. Callahan himself were "very nervous."

"People who build aircraft parking aprons do not like to see puddling when they're through...." If an eight-inch concrete overlay were placed on the one-inch bond breaker, the apron would parallel the grade of the bond breaker below. The result would be that puddles like those found on the bond breaker would not drain on the finished surface. The Navy was concerned about the puddling. Lt. Commander James R. Applegate, Deputy ROICC at Fallon, who was Lt. Markey's supervisor, testified by deposition that "what we saw there would not have been acceptable as a final surface."

Puddling was a concern to plaintiff as shown by the testimony of Messrs. Morin and Sweet. Principally, if the puddles did not drain and were allowed to freeze and thaw, cracking and spalling of the cement apron might result. Cracked and broken cement causes FOD. Additionally, standing water on the aircraft apron was thought to present a safety hazard to Navy work crews. Finally, plaintiff's field supervisors were diligent and conscientious and took pride in their work; they did not want to deliver an inferior product.

Paving to the contours instead of a straight eight-inch overlay provided a superior product. Since it tracked the contours that existed prior to the renovations, Drawing C–4 represented a proved drainage pattern—a pattern that would not result in puddling, FOD, or a safety hazard.

Although it was undisputed that paving to the contours provided a superior product, the Navy engineers were of a different mind as to the seriousness of the deficiencies of an eight-inch overlay. Mr. Dutton testified that neither he nor the Navy considered puddling on the completed apron to be a major concern. He premised his own view on a number of factors. First, Fallon Air Force Base, located in the Nevada desert, received approximately five inches of precipitation a year. Further, given that the aircraft the apron would be hosting are designed to be flown and serviced in all types of weather, patches of standing water an inch deep would not undermine any Navy missions. Lastly, contemporaneous with the installation of the A.C. bond breaker, Mr. Dutton and Lt. Markey began to plot the apron's drainage pattern. Using the survey commissioned by WESTDIV dated September 3, 1985, Lt. Markey and Mr. Dutton concluded that paving to an eight-inch overlay would provide sufficient drainage.

While an eight-inch overlay, with appropriate adjustments, was a workable option, paving to the C–4 contours would provide a better, if more expensive, product. It was decided during a September 26, 1985 conference call between the Assistant ROICC staff, including Lt. Commander Applegate, the Deputy ROICC, and the staff of WESTDIV, that no direction on how to proceed would be given to plaintiff. Rather, plaintiff would be given the option of either paving to the contours or laying down an eight-inch PCC overlay.

On September 25, 1985, Lt. Markey orally informed plaintiff that a concrete overlay of eight inches as shown in Drawing C–13 would be acceptable. Lt. Markey testified that after having been informed that an eight-inch overlay was acceptable, plaintiff's project superintendent Harold Lien responded that plaintiff was going to pave to the contours.

On September 26, 1985, a meeting was held at the site between representatives of the Navy, including Lt. Markey; members of plaintiff's construction crew; and employees of Thompson & Hysell Engineering ("Thompson & Hysell"). Lt. Markey testified that while he was inspecting the amount of puddling on the bond breaker, he was approached by members of plaintiff's crew about problems with "putting in the concrete." When informed that the transition to the Brutoco apron was seven inches above the existing bond breaker, Lt. Markey orally informed plaintiff that WESTDIV had approved paving to seven inches at the transition. It was at this time that problems in meeting the transition point with the KDH taxiway were first discussed. Lastly, plaintiff's crew had expressed concern that if they paved according to the contract drawings in the areas

where electrical vaults had been raised, poor drainage would result.

Lt. Markey's oral authorization was followed on September 27, 1985, by Lt. Markey's letter, acknowledging Mr. Lien's assertion that there was a discrepancy between Drawings C–4 and C–13, further stating:

> For clarification, either paving to meet the contours shown in the plans or paving to achieve an 8″ PCC overlay will meet the Contract requirements. Calfon has the option to choose which method they will utilize at no change in the contract cost or time.

Lt. Markey's September 27 letter also reflected that Mr. Lien had contacted Roy B. Smith, another Navy civil engineer, stating that plaintiff's bid called for paving to the contours shown on Drawing C–4 and that plaintiff intended to proceed based upon its bid. According to Lt. Markey's letter, Mr. Smith had informed Mr. Lien that paving to the contours would be acceptable.

On September 30, 1985, Lt. Markey sent plaintiff a topographic grid. The cover letter specified that inclusion of the grid was at plaintiff's request. The letter also stated that "thickness problems will be identified to this office prior to the placement of the PCC pavement so corrections can be made." The letter advised that the grid was not part of the original contract; that the contractor was responsible for verifying elevations; and that the use of the grids should not result in any additional costs, delays, or claims to the Navy. On the same date, plaintiff began laying out the grid for its final paving.

Lt. Markey testified that plaintiff made no further inquiry following the September 27 and 30, 1985 letters and sought no further clarification of the option offered in the September 27 letter. According to Lt. Markey, plaintiff did not register any protest prior to performance of the work or challenge the option as illusory. Nor did plaintiff request a waiver of the contractor's warranty contained in paragraph 62 of the contract's General Provisions or any other statement or assurance beyond that contained in the September 27, 1985 letter limiting plaintiff's responsibility for placing an eight-inch overlay. Lt. Markey stated that plaintiff did not submit to him any notice that it regarded the September 27 letter, or any other directive that was issued during administration of the contract, as a change order which required paving to the contours pursuant to Drawing C–4.

Plaintiff takes pointed exception to Lt. Markey's recollection. Mr. DeBellis, President of plaintiff corporation, testified as to a later meeting on September 26, 1985, with Lt. Markey before the September 27, 1985 letter, during which it was agreed that plaintiff would pave to the contours so as to assure proper drainage:

> Well, what transpired at that meeting is that we established that we would let [plaintiff's surveyors] Thompson and Hysell stake the project out so that it would drain. And we would stab the concrete so that we could determine how much concrete was being used because one of the statements from, like Lt. Markey was, he didn't want to be surprised at any point at the project that there were some overruns or some underruns that would be less than six inches, which might cause problems with the airplanes sitting on top of them.
>
> . . . .
>
> ... So, based on the total project, in order to get something that was acceptable that Calfon could also walk away from knowing that they had done a job that was [proper] and acceptable to the Navy so that we wouldn't have to—if we poured just a straight inch overlay and ignored everything else, and came up with a puddling and ponding and problems with the apron—that we wouldn't have to tear out and redo.
>
> . . . .
>
> When I left the project, [after the meeting] everybody was under the understanding that we would—Thompson and Hysell would lay out the paving grades and lines so that everything would drain properly. And, that was the understanding for them to proceed on that basis.

Mr. DeBellis did receive Lt. Markey's letter of September 27, 1985, advising plaintiff that it could pursue either of the options, but he did not countermand the letter. Mr. DeBellis testified that regardless of the contents of the letter, he felt that an agreement had been reached whereby plaintiff would receive an upward adjustment in the contract price for paving to the contours:

> I didn't respond to the letter because we had already done an agreement and I thought the letter was just another situation of somebody putting down, on paper, something different than what we agreed to. And, I wasn't going to contest it at that point because I had to give a job. I had to complete the job at the airport that would give them something that was acceptable.

Mr. Sweet, plaintiff's grade foreman, similarly recalls Lt. Markey committing to an adjustment in the contract price for any concrete overrun:

> [Lt. Markey and I] were discussing the new contours that we had engineered into it, and there you know, all the stations were being stabbed by the Con rep to record, and then if there was any surprises they would have them right now, and if there were any adjustments well, we'd know which way to go.

He also described the agreement in the following language:

> A: ... I was talking with Lt. Markey on the apron time and he was telling me that they were going to stab the concrete as we poured to make sure there were no surprises because we had picked up the thickness to 12 inches in places and tried to stay with a minimum thinness.
>
> Q: There were no surprises as to thickness, correct?
>
> A: As to thickness and—no the surprises were as to overrun because we had stated if we raised the ridge lines it's going to overrun. So the Navy said well, try to stay within the quantity if you can and we'll stab it and the we'll know what adjustments have to be made at the end.

Mr. Morin, plaintiff's quality control representative, was a particularly credible witness due to his intensity and precise testimony. He testified to his understanding: "I believe it was all in agreement that if we had an overrun, Mr. DeBellis would have [an] adjustment coming. If there was an underrun, the Navy would have a credit." Before paving commenced, according to the Navy's construction representative Mr. Callahan, Messrs. Lien and Morin told him that plaintiff was going to be compensated for paving to the contours. Mr. Callahan alerted Lt. Markey, who took the position that he had made no such agreement—that, indeed, when Lt. Markey told Messrs. Morin and Sweet that he was not " 'going to pay for any concrete....' ", they said " 'We can make it balance. It's not that hard, we can give you a good job....' " Lt. Markey interpreted these statements to mean that plaintiff would not use more concrete than it had planned by paving to the Drawing C–4 contours. According to Lt. Markey, he made his position clear to Mr. DeBellis, as well. These conversations took place before Lt. Markey's September 27, 1985 letter.

In the days following, plaintiff's surveyors Thompson & Hysell prepared a new paving grid—not based on either Drawing C–4 or C–13—so as to place the electrical vaults flush with the pavement, guard against thin pavement, and assure proper drainage. Plaintiff ultimately followed the Thompson & Hysell paving plan in completing the work. Lt. Markey testified that the Thompson & Hysell paving plan differed from Drawing C–4, but following the surveyors' plan utilized an equivalent amount of concrete as would have been used in paving to the C–4 contours. In Lt. Markey's view, the Thompson & Hysell design was "a variation on the C–4 contours."

On October 17, 1985, Brutoco, plaintiff's subcontractor, began placing the PCC overlay in accordance with the Thompson & Hysell paving plan. By letter of November 5, 1985, Verner E. Thomas, Brutoco's Project Manager, notified plaintiff that the actual grade stakes tracked an increase in concrete over that indicated in Drawing C–13. Brutoco's letter contained the following: "A review of actual Grade Stakes

versus the indicated Paving Section shown on page C–13 of the Contract Plan, indicates an increase in the quantity of concrete area computation shows a 1400 cubic yard increase in the concrete paving...." Brutoco requested issuance of a change order in the amount of $53,900.00 for the additional work.

On November 13, 1985, plaintiff submitted to the Navy a copy of the November 5, 1985 letter from Brutoco identifying an overrun of 1,400 cubic yards. Plaintiff also requested the issuance of a change order. Lt. Markey responded on December 2, 1985, referring plaintiff to his September 27, 1985 letter, which identified plaintiff's option of either paving to contours or providing an eight-inch PCC overlay. Since plaintiff elected to pave to the contours and controlled the survey of the guide wire elevations and the finished grade, as well as placing the guide wires, Lt. Markey was of the view that no adjustment to the price or time of performance was justified. On December 5, 1985, paving of the apron area was completed. The remainder of the paving of the taxiways and fill-in areas was completed on January 7, 1986. Plaintiff's work was accepted. Not only were there no drainage problems, but Mr. Callahan, the Navy's construction representative, expressed great confidence in plaintiff as an honest contractor and was obviously pleased that plaintiff, by paving to the contours, had "[solved] a lot of problems," including "giv[ing] us proper drainage."

On January 27, 1987, plaintiff submitted an estimate for a change order and, in the alternative, a certified claim in the amount of $95,982.96 for the extra work performed by Brutoco and a 12–day time extension. The claim figure represented costs to plaintiff of $40,739.91, costs to Brutoco of $46,584.21, additional costs for plaintiff's overhead of $2,329.21, and a profit of $5,379.20. A bond premium charge of $950.33 also was included.

Lt. Markey's written response on March 9, 1987, stated that his office "does not consider the quantity of concrete actually placed to be the issue. If additional concrete was placed ..., it was due to decisions by the contractor and not government direction...."

On April 3, 1987, the final decision of the contracting officer was sent to plaintiff. The decision chronicled the events leading up to the request for additional compensation and time. Specifically, the decision identified Lt. Markey's position regarding what constituted acceptable performance:

Resident Officer in charge of Construction ("ROICC") letter ... of 27 September 1985 addressed a telephone conversation with your Superintendent in July 1985 relating to the variance in concrete quantities to be placed in complying with contours shown on sheet C–4 rather than the 8″ shown on Sheet C–13, and your additional costs incurred. The letter noted that on 25 September 1985 your Superintendent was informed that the 8″ overlay would be acceptable, and on 26 September 1985 your Superintendent stated your bid was based on meeting finish contours and paving would be done in this manner. The letter stated that either method would meet contract requirements, and you had the option to choose either at no change in contract cost or time.

The decision letter further stated that plaintiff's method of paving was optional, even though plaintiff believed that it was required by its bid to pave to the contours. The contracting officer's conclusion reads, as follows:

The claim documentation shows that upon your request for clarification on the thickness of concrete sections, the ROICC advised you that you had an option to pave to the contours shown on Sheet C–4, or place an 8″ overlay as shown in the typical section on sheet C–13. The ROICC states in such documentation that your Superintendent advised him you had bid to meet the finish contours and you would pave in this manner.

Plaintiff filed suit in this court on December 28, 1987.

## DISCUSSION

Plaintiff and defendant have two competing models of what apron would solve the

problems confronted during construction, meet the contract specifications, and not subject plaintiff to liability under the Warranty of Construction clause. The Navy concedes, through Lt. Markey, that the differences between the models are significant. As Lt. Markey testified, plaintiff's plan of paving to the contours "would've given a better design, it would give a Cadillac, [while paving to] the eight inches would give a Chevy...."

Plaintiff's view of what was required by the contract specifications and needed to solve the problems encountered during performance was an apron that ran flush with the neighboring work and provided proper drainage. The Navy's view was that minor adjustments could be made so as to join plaintiff's apron with the adjacent projects and that drainage was less important than providing structural soundness and keeping the renovation work within budget. The issues in this case thus center around whether the Navy directed plaintiff to produce the superior product where alternate, less expensive performance was feasible. If the Navy either directed plaintiff to pave to the contours created by Thompson & Hysell or "agreed" that it would compensate plaintiff for the increased costs, plaintiff would be entitled to an equitable adjustment under the contract's Changes clause.

### 1. Illusory choice

■ To recover under the contract's changes clause on the basis of a constructive change—for work beyond that required by the contract, but without a formal change order—the contractor must show that the requirements of the contract were enlarged and that the additional work was not volunteered, but was ordered by a government officer having the requisite authority. *Len Co. & Assoc. v. United States*, 181 Ct.Cl. 29, 38, 385 F.2d 438, 443 (1967). It is insufficient to show that the Government disapproved a mode of performance; rather, the Government must have directed the contractor to perform the additional work. *Singer Co., Librascope Div. v. United States*, 215 Ct.Cl. 281, 289–90, 568 F.2d 695, 701 (1977). Plaintiff and

defendant's views diverge, first, on whether the alternative methods of performance relieve the Navy from liability for the overage of concrete encountered by plaintiff, thereby rendering plaintiff a volunteer; and second, whether the option of alternative methods was illusory, thereby providing plaintiff with only one method of performance requiring the use of additional concrete.

■ Plaintiff asserts that in order to be found a volunteer, the alternative methods of performance proposed by the Navy must be real. If there is only one realistic course of performance, the contractor is entitled to an equitable adjustment. *See Calfon*, 17 Cl.Ct. at 177 (discussing board cases cited by plaintiff).

It is undisputed that paving to the contours delineated in the Thompson & Hysell survey would require more concrete, and thus be more costly, than a straight eight-inch overlay. Plaintiff contends that the less costly option of paving an eight-inch overlay was illusory because it would not provide acceptable drainage and that under the circumstances plaintiff had no choice but to perform the more expensive work. By this plaintiff does not suggest that placing eight inches of concrete over the asphalt bond breaker required engineering that was beyond the state of the art. Rather, it argues that were plaintiff to choose the overlay option, puddling would result and thereby expose plaintiff to a breach of warranty claim. Thus, plaintiff asserts, paving to an eight-inch overlay is not an option, if it would produce results that the Navy would not later accept. The testimony of Mr. Sweet, plaintiff's grade foreman, demonstrates the point well:

[Lt. Markey and I] talked about the contour paving and that when we had to pave to the contour that eliminates any drainage problems....

. . . .

... Otherwise you would have built big lakes in the pad and it wouldn't really have been serviceable.

Navy civil engineer Dutton testified that apron drainage is a design characteristic

and that, therefore, the Navy would not be able to hold plaintiff liable for the failure, if any, of Navy produced designs. Noted Mr. Dutton, plaintiff was not required to solve the drainage problems; its "only obligation" was to construct the apron according to the plans furnished by the Navy. Even if Mr. Dutton could not bind the Navy not to disavow his opinion as unauthorized, Lt. Markey's September 27, 1985 letter amounted to an admission that the contract could be satisfied by alternate methods of performance. Lt. Markey had authority to so bind the Navy, and Lt. Commander Applegate concurred in the approval of the September 27 letter. This letter overcomes Lt. Commander Applegate's view that puddling on the PCC overlay tantamount to the puddling on the A.C. bond breaker would not have been acceptable. Lt. Commander Applegate also made clear in his deposition that he would defer to civil engineers on this subject.

Further, defendant was able to illicit from plaintiff's quality control representative Mr. Morin two key facts: First, despite "considerable" puddling on the neighboring Brutoco apron, Brutoco's work had been accepted.[1] Second, from an engineering standpoint, the Navy's direction to raise the electrical vaults to the grade of the new pavement was not inconsistent with an eight-inch overlay. Defendant's position, thus, is that if small amounts of puddling on the finished surface were acceptable to the Navy, the eight-inch overlay was a viable option.

The court finds that the Navy was well within its contractual rights to determine how much puddling it would accept and thereby presented plaintiff with two genuine options. The Navy's role as designer would preclude it from holding a contractor liable for inadequacies in the contract designs. *See J.D. Hedin Constr. Co. v. United States,* 171 Ct.Cl. 70, 347 F.2d 235 (1965); *J.L. Simmons Co. v. United States,* 188 Ct.Cl. 684, 412 F.2d 1360 (1969); *cf.* 48 C.F.R. § 52.246–21(a) (1988) (contractor warrants that designs it furnishes to the government will be free from defects). It is true, as Mr. DeBellis justifiably lamented, that the Navy could have taken the position that the overlay was the result of faulty workmanship and forced plaintiff to the "tremendous" expense of ripping out the apron and repaving it. Even if a lawsuit could have recouped plaintiff's financial outlay, plaintiff would have faced the burden of financing the extra work and wasted time.

No pithy answer assures the legitimate concern of a small contractor confronting the formidable contract powers available to the Government. Fortunately for the Navy, this case does not exhibit overreaching. That the Navy could have taken an unreasonable position and forced the contractor to litigate does not warrant a judicial decision that the Navy was required to pay for a more expensive product than that which it had stated in writing would satisfy the contract, provided that the paving was accomplished in a workmanlike manner.

2. *Agreement to make adjustment for overrun*

■ In addition to its theory of an illusory choice, plaintiff also asserts that the Navy, through its authorized representative Lt. Markey, both directed plaintiff to pave to the Thompson & Hysell contours and agreed to award plaintiff an adjustment in the contract price. Plaintiff endeavors to prove the existence of the agreement through a variety of facts and circumstances.

Initially, plaintiff sought to prove an express agreement. The testimony of Mr. DeBellis, plaintiff's supervisors on the site, and Mr. Callahan, taken together, does not manifest the clear understanding requisite for a contractual undertaking. *See Prudential Ins. Co. of America v. United States,* 801 F.2d 1295, 1297 (Fed.Cir.1986), *cert. denied,* 479 U.S. 1086, 107 S.Ct. 1289, 94 L.Ed.2d 146 (1987). Mr. DeBellis testi-

---

**1.** Mr. Morin testified after having reviewed photographs showing puddles on the Brutoco apron.

fied that Lt. Markey agreed to pay for any overrun; Messrs. Morin and Sweet testified to their understanding that an agreement had been reached; Mr. Callahan alerted Lt. Markey that plaintiff's supervisors had mentioned an agreement to compensate plaintiff. Even if the court were to discount Lt. Markey's testimony, his September 27, 1985 letter is inconsistent with any such agreement and put plaintiff on notice that the Navy disavowed any obligation to pay additional monies for placing the PCC overlay. Lt. Markey's conduct in sending the letter is consistent with his testimony; Mr. DeBellis' conduct is not. Mr. DeBellis was silent, by his own testimony, until after November 5, 1985, when Brutoco demanded payment from plaintiff. Mr. De-Bellis's silence markedly contrasts with his conduct when he considered that Lt. Markey later took a position inconsistent with a prior oral agreement. On that occasion Mr. DeBellis promptly wrote Lt. Markey reminding him of the earlier agreement.

Mr. DeBellis also asserted that the "stabbing" of the concrete grade by the Navy's construction representative Mr. Callahan evidences the Navy's intention to compensate plaintiff for any overrun in concrete. "Stabbing" is a process whereby a metal rod of a predetermined length is pushed into the concrete, so that the Navy and the contractor's quality control representative can determine how much material has actually been placed on the grade. As Mr. DeBellis testified:

> [Lt. Markey and Mr. DeBellis discussed the two options offered plaintiff.] ... We did come to an agreement. [Lt. Markey] knew what was going on all the time[;] that we were doing it[;] because I don't know why they would have stabbed the concrete if he hadn't agreed with what we had originally talked with. They continued to stab the concrete, as we did, per the original agreement. I don't know why you would do that if you rested your case on the—you rested on [the September 27] letter.

Mr. DeBellis' question is answered by the testimony of Mr. Callahan and that of his quality control representative Mr. Morin. As Mr. Callahan testified, the purpose of "stabbing" the grade is not necessarily to prepare for an equitable adjustment. More often it is to assure that the required amount of concrete has been laid. Mr. Callahan explained:

> Probing the concrete with a rod to see how much is being put down and measure it that way after the paving machine goes by. That way the government knows if there—contractors sometimes, not these, but some contractors do cheat. And if they cheat an inch or half an inch over several thousand square feet, it's a considerable amount. And that's why we do it. And also we know the true depth of the concrete.[2]

Particularly where the Navy was concerned about whether the apron would be able to support visiting aircraft, the thickness of cement actually laid would be of interest. This finding is bolstered by the testimony of Mr. Morin. He testified that stabbing was a routine procedure and had been employed on every Navy contract that he had worked on. The court, therefore, can attach no special significance to the fact that the Navy stabbed the apron work, least of all that it evidences an agreement to grant plaintiff an upward adjustment in the contract price.

Plaintiff, through the testimony of its expert in concrete design and drainage of pavement, Steven H. Gebler, suggests that the Navy acted in bad faith by not permitting plaintiff to pave to a seven-inch contour throughout, thereby avoiding a concrete overrun:

> If you read some of the documents there was a question of tightness of money on this particular project. So, one way to keep the cost in line would have been to, say, use less concrete. Therefore, [it] would have kept them within the budget that they started off with....

---

**2.** It is worthwhile to note that the overrun of 1,400 cubic yards of concrete in the instant case amounts to only one-fourth inch of added mate-

rial when spread out over the length of the entire apron.

... By looking at the seven-inch [as] structurally [satisfactory], which they could have lived with, then they could have at least done that. But, the problem here is they never told Calfon. They didn't give them that option. That was never transmitted if you go through the documents. ...

The charge refers to the fact that during the September 26, 1985 telephone conference between the Assistant ROICC staff, including Lt. Commander Applegate, and the staff of WESTDIV, it was decided that even though a seven-inch transition point between plaintiff's apron and the Brutoco apron would be acceptable to the Navy, no direction on how to proceed would be given to plaintiff. According to Lt. Markey, the disagreement focused on the transition at the Brutoco apron. Mr. Dutton, who viewed structural strength as a more compelling concern than drainage, had calculated that seven inches was adequate; WESTDIV disagreed. WESTDIV was persuaded that seven inches would work. However, WESTDIV's concurrence went beyond the problem at the Brutoco apron. Lt. Markey knew at that time that if plaintiff paved to the contours throughout the project there would be some areas that were seven inches—clearly at the Brutoco apron—and some as high as nine inches. "We knew their variances and we figured that would result in more concrete." Indeed, after the claim was made, the Navy calculated that the average depth of the concrete over the entire apron was approximately eight and one-quarter inches.

Although Mr. Gebler suggests that the Navy "[hid] information" from plaintiff, in the sense that seven inches would be acceptable throughout, the court cannot attach such a motive to the Navy's decision not to provide direction to plaintiff. The testimony and exhibits establish that Lt. Markey and Mr. Dutton only sought approval for seven inches at the transition. The Navy's investigation and discussions were for the purpose of determining whether, if plaintiff paved to the contours by laying seven inches of concrete at the transition with the Brutoco apron, the result would be acceptable. The Navy decided that seven inches of concrete at the transition would meet the Navy's needs.

In large measure the Navy's conduct in not advising plaintiff that seven inches had been approved at the transition is a product of the law of Government contracts. The Changes clause included in plaintiff's contract, paragraph 3 of the General Provisions, provides that any "direction, instruction, interpretation or determination" from the Contracting Officer that effects a change in the contract may be compensable by an equitable adjustment. If direction to proceed on a given option varied from plaintiff's original plan, the action may have resulted in a claim for increased costs. The contract called for eight inches of PCC in addition to the one-inch bond breaker. Since the Brutoco apron was one inch lower at the transition with plaintiff's apron, such a directive could have been interpreted as a direction to tear out the bond breaker to accommodate the required eight inches. However, once the Navy determined that seven inches provided adequate strength, the contractor was not required to do extra work.

Nonetheless, the notion is troubling that the Navy gave plaintiff an option to pave to the contours, at no additional cost, when the Navy knew that the option would utilize more concrete than the eight-inch overlay. The Navy wanted to avoid mandating particular conduct that would have made the Navy liable for a contract change. The Navy viewed the eight-inch overlay as providing acceptable drainage, with the increase in cement at the KDH taxiway and the decrease at the Brutoco apron as offsetting. The Navy also viewed paving to the contours as even more acceptable, with the offsets as discussed and the Thompson & Hysell design contours as not effecting a net increase over Drawing C–4. As Mr. Dutton summarized, "WESTDIV policy is that if there is a case of a possible conflict the contractor has the option of choosing the less expensive method of doing the work." Thus, the Navy's unwillingness to give contractual direction among the op-

tions[3] does not evidence withholding of vital information from plaintiff or luring it into a ruinous course of conduct.

### 3. Requirement of written notice under the Changes clause

■ The Changes clause states that if the contractor receives direction from the contracting officer that changes the contract and is not accompanied by a formal change order, the contractor must provide written notice to the contracting officer that it considers the order a change in the contract. Paragraph 3 states in full:

> (b) Any other written or an oral order (which terms as used in this paragraph (b) shall include direction, instruction, interpretation or determination) from the Contracting Officer, which causes any such change, shall be treated as a change order under this clause, *provided that the contractor gives the contracting officer written notice* stating the date, circumstances, and source of the order and that the Contractor regards the order as a change order.

(Emphasis added.) Plaintiff conceded at trial, and again in brief, that while it considered paving to the Thompson & Hysell contours a compensable change, neither Mr. DeBellis nor any employee or other officer of plaintiff gave written notice to the Navy of that view. The court finds that the discussion between Mr. DeBellis and Lt. Markey, although it did not constitute an agreement, certainly put Lt. Markey on notice of plaintiff's position. Nonetheless, plaintiff remained silent after Lt. Markey's September 27, 1985 letter posing the options and advising that exercise of either option would be without cost. The issue is whether plaintiff's failure to apprise the Navy in writing after September 27, 1985, bars a later claim for an equitable adjustment.

The case law makes clear that while two distinct lines of authority exist, there is but one overriding legal principle: Written notice as to constructive changes must be supplied by the contractor before such time that the Government would suffer if not apprised of the facts. The divergence in the case law parallels the factual distinctions that can be made between different types of cases. In some instances immediate notice from the contractor is of minimal benefit, and the Government suffers no prejudice from not having had written notice at the time the constructive change occurs. For example, if the contracting officer deliberately gives the contractor an oral direction to proceed in manner different than that outlined in the specifications, with knowledge of the probable results, the notification requirement has not been enforced strictly. The leading case is *W.H. Armstrong & Co. v. United States*, 98 Ct.Cl. 519 (1943). The Court of Claims reasoned:

> There is not a word in the record to show that the order of the Constructing Quartermaster, by which he saved some hundreds of thousands of bricks of good quality and diverted them to a more economical use for the Government, was in fact given without consultation with and sanction of his superior officers in the department. There is no evidence that the department was not pleased at and benefitted by the result accomplished by the order. There is no evidence that the Contracting Quartermaster was disciplined or even reprimanded for having, in violation of the mandate of the defendant's standard contract, ordered this extra work, the consequence of which was, unless we give relief, to cheat plaintiff out of a large amount of money, and involve the department in an act of repudiation which, if done by anyone other than the government, would be regarded as dishonorable, even if legally permissible.

*Id.* at 530.

If the contracting officials have knowledge of the facts or problems that form the basis of a claim and are able to perform necessary fact-finding and decisionmaking,

---

**3.** There was three—paving to eight inches; paving to the contours; and paving to the contours as modified by the Thompson & Hysell survey.

The latter two options did not call for different quantities of concrete between them.

the Government is not prejudiced by the contractor's failure to submit a precise claim at the time a constructive change occurs. *Accord W.C. Shepherd Co. v. United States*, 125 Ct.Cl. 724, 735, 113 F.Supp. 648, 653 (1953). In discussing the timeliness of notice, the Court of Claims remarked in *W.C. Shepherd:*

> Since the contracting officer had been immediately apprised of the conditions, he at any time could have determined whether they differed from those shown on the plans and specifications, or were of an unusual nature differing materially from those ordinarily encountered. Plaintiff's failure to make this claim at the time the condition was discovered did not impair the ability of the contracting officer to make the determination when the claim was made.

125 Ct.Cl. at 733, 113 F.Supp. at 652; *cf. G.M. Shupe Inc. v. United States*, 5 Cl.Ct. 662, 727 (1984) (Government not prejudiced by contractor's failure to assert formal claim within notice period where contracting officer knew operative facts and directed alternate performance as result of difficulties encountered).

On other facts lack of immediate notice seriously can prejudice government interests. Where contractor silence would foreclose less costly alternative solutions or the ability of the Government to avoid contractor claims, timely notice is required. In *Ling–Temco–Vought v. United States*, 201 Ct.Cl. 135, 475 F.2d 630 (1973), the contractor was precluded from recovering because it failed to warn the contracting officer that it was holding the Navy liable for contract overruns. The contractor's failure to notify the Navy of its position deprived contracting officials of the choice whether or not to end contract performance. *Ling–Temco–Vought*, 201 Ct.Cl. at 149–50, 475 F.2d at 638. The point is further illustrated by *E. Walters & Co. Inc. v. United States*, 217 Ct.Cl. 254, 576 F.2d 362 (1978) (per curiam). The contractor had structured its bid such that its prices for smaller quantities of fuses were lower than prices at higher quantities. At the time of award, the contracting officer responded by plac-

ing orders for the maximum amount of fuses at the lower price and exercising options for "concurrent delivery" of added quantities at the same "low" price. One year after the contract was awarded, and six months after final delivery, the contractor complained that the Government should have combined the orders and purchased all the fuses at the higher scheduled prices. Dismissing plaintiff's complaint, the court stated:

> Nor did plaintiff timely protest the exercise of the first option. The board opinion is correct in characterizing this silence until after final delivery, as a waiver. By January 13, 1972, plaintiff knew of all the awards made to that date. Any misunderstanding on plaintiff's part with regard to how defendant viewed the option clause, ended with receipt of the Government's letter specifying the award pattern....
>
> In these circumstances, the doctrine of estoppel is also for application. Had plaintiff protested the use of the option provision at the time of award, defendant would have been in a position to either reaffirm its use of the option provision ... or it could have elected instead, to award the non set-aside quantity in the next least expensive manner.... Plaintiff's silence deprived the Government of that relatively painless alternative.

217 Ct.Cl. at 264–65, 576 F.2d at 367–68 (footnotes omitted). The import of *Ling–Temco–Vought* and *Walters* is that contractors are duty bound to inform the contracting officer if official direction will result in claims against the Government. *Cf. Powers Regulator Co.*, GSBCA No. 4,668, 80–2 B.C.A. (CCH) ¶ 14,463, at 71,321, 1980 WL 2546 (focus is whether prompt notice by the appellant might have averted the liability the appellant now requests the board to impose on the Government). Judge Tidwell of the Claims Court wrote:

> Plaintiff must act to protect its own best interests. For example, if plaintiff cannot submit a timely written claim because it lacks the necessary information to do so and has not discussed the point in issue with the contracting officer or the [Contracting Officer's Representa-

tive], it has not met its duty. The type of harm that could accrue to the government under this example would be a preclusion by the government from considering the directive in a different light, whether it be from the contracting officer or the COR, to determine if it is a change order and if so, is it what defendant wants.

*Simko Constr., Inc. v. United States,* 11 Cl.Ct. 257, 278 (1986), *vacated and remanded on other grounds,* 852 F.2d 540 (Fed.Cir.1988).

Plaintiff argues that its claims for adjustment should not be excluded on the basis that it failed to give notice to the contracting officer regarding the constructive change. Plaintiff asserts, citing *Hoel–Steffen Construction, Inc. v. United States,* 197 Ct.Cl. 561, 456 F.2d 760 (1972), that this case falls into the first category of authorities—those in which lack of notice is not prejudicial to government interests. Quoting the famous passage in *Hoel–Steffen* that "notice provisions in contract-adjustment clauses [should] not be applied to technically or illiberally where the Government is quite aware of the operative facts....", 197 Ct.Cl. at 573, 456 F.2d at 768, plaintiff argues that notice would have served no useful purpose.

Factually *Hoel–Steffen* differs from the case at bar. The communications between the contractor and the Government alone are a basis for distinction. Particularly of interest is how the *Hoel–Steffen* court highlights the official response to the contractor's complaints to signify the Government's knowledge of essential facts. Holding that the contractor had given sufficient notice to the contracting officer for the latter to take action on the complaint, the Court of Claims remarked:

> In this instance [notice was given] by plaintiff's letters of October 10th and 11th which, in asking for time extensions under the contract, referred directly to the delay caused by the other contractors' interference with Hoel–Steffen's access and to meetings with the Government on the problem. Change Order 5 (referred to above) served the same purpose with when it acknowledged "that progress on some portion of your work has been slowed by another contractor".... It is impossible for us to read these documents, realistically, as confined solely to the alleged misconduct of [other contractors] as if the Government were not involved. The defendant's "acts or failures to act", in solving the dispute, were markedly implicated.

197 Ct.Cl. at 573, 456 F.2d at 767.

In this case, however, plaintiff did not "markedly implicate" the Government's involvement in increasing its costs—namely, that plaintiff was paving to the Thompson & Hysell contours because it considered the new work a government-ordered change. To the contrary, Mr. DeBellis ignored the letter from the contracting officer stating that plaintiff was free to choose its method of performance. Given the divergent views expressed by Mr. DeBellis and Lt. Markey as to who would assume any increase in costs, a letter stating the contractor's position would have served a useful purpose.

Lt. Markey testified persuasively that his face-to-face discussions with plaintiff's representatives and Thompson & Hysell, prior to his September 27, 1985 letter, convinced him that the lesser quantity of cement required at the Brutoco apron transition would balance out with the greater quantity at the smaller KDH taxiway transition; that the one-inch bond breaker may not have been quite even, so that plaintiff may have considered paving to eight inches overall unsatisfactory; and that in paving to the contours plaintiff could balance out its anticipated quantity by lowering the high spots and filling in the low areas to at least seven inches. In other words, the Navy knew that paving to the contours required more cement than the eight-inch overlay, but Lt. Markey was credible that he viewed plaintiff as intending to pave to the contours without increasing the quantity of cement that it planned to use. Lt. Markey's September 27, 1985 letter memorializes this understanding of plaintiff's plans. His September 30 letter requested notification of any problems with paving depths. Lt. Markey established that the

Navy was prejudiced by not being advised that plaintiff viewed paving to the contours as a change:

THE COURT: What would you have been required to do, precisely? When you get a letter from a contractor saying that, regarding a direction as the basis for an equitable adjustment is going to make a claim?

THE WITNESS: What I normally do is a series of things. I immediately issue a proposed change order number, and enter it in the change order log, which I keep. I normally call the moneyman, which in this case was Richard Scott, the—at WestDiv who had the budget for the project, and say we have a potential change order, and I do a government estimate, or have my engineers do an estimate of the dollar amount, and that's the start.

THE COURT: Are you saying that in this case, you would have made a request for a change order?

THE WITNESS: I say, it depends on what was disputed. If he said, you told us to go to the contours, versus eight inches, I would have said, "Oh, let's go to eight inches then." If you would have said that the Thompson and Hysell survey came up with additional concrete usage, above and beyond C–4, I would say "How much?". My letter of September 30th, had in there that if they felt like there [were] pavement thickness problems to let me know before they started to pave. So if I found out they had pavement thickness problems, which I equate also with an overrun, it depends on what the problem was. If they said this area is high, and it result in an overrun, I would have looked at the survey to see if we could lower an area.

If they had an area where the pavement was thin, see if we could fill it in, so it's difficult, Your Honor, to give you a specific answer.

THE COURT: But if, to repeat, the letter would've come back saying "but you told us to pave to the contours," you would have countermanded that?

THE WITNESS: Yes.

THE COURT: You would have said, "go ahead, pave to the eight inches."

THE WITNESS: Exactly.

THE COURT: Would you have been willing at that time to say there was a design error, to alleviate the contractor's concerns that Mr. Lien had communicated to you?

THE WITNESS: I wouldn't have initiated it. However if Calfon had come back and said, if we go to eight inches, we think there is going to be severe puddling, and I would have said, "You will not be responsible for puddling that results from choice of this design."

THE COURT: Do you have authority to do that?

THE WITNESS: Yes, I do.

Proper action by the contractor in this case would have been upon receipt of Lt. Markey's September 27, 1985 letter, or after the letter of September 30, to send notice to the contracting officer that plaintiff considered the added work and expense a change to the contract. *Cf. Kings Elec. Co., Inc. v. United States*, 169 Ct.Cl. 433, 341 F.2d 632 (1965) (delay damages denied in part because contractor's failure to notify government denied agency opportunity to attempt a solution); *J.A. Ross & Co. v. United States*, 126 Ct.Cl. 323, 329, 115 F.Supp. 187 (1953) (duty to protest added work as a predicate for later claims is basic to all government contracts); *Mil–Pak Co. Inc.*, ASBCA No. 19,733, 76–1 B.C.A. (CCH) ¶ 11,725, at 55,874, 1976 WL 1905 (if contractor did not agree with contracting officer that omitted work fully compensated it for additional work, contractor obligated to notify Government before the work was substantially completed).

Defendant introduced at trial two letters of Mr. DeBellis wherein he complained to the Navy about directions given to plaintiff on this contract. On May 2, 1985, Lt. Markey wrote plaintiff concerning directions to stop stripping on the Hanger apron. He wrote: "If you feel these actions constitute a change to the subject contract, please notify this office immediately." Mr. De-Bellis responded by letter of May 6, 1985, that any further stripping would cost the

**442**

Navy another change to the contract. More pertinently, on August 29, 1985, Lt. Markey wrote plaintiff that it was delinquent in resubmitting a sample of PCC for testing and that all payments on the contract would be held up. By letter of September 4, 1985, Mr. DeBellis reminded the Navy that it had agreed to accept the sample only when plaintiff began to crush at the site. Mr. DeBellis wrote letters in the ordinary course of business with the Navy, so as to preserve plaintiff's rights. He had taken occasion to write the Navy when it was not honoring an agreement. He wrote such a letter on September 4, 1985. In this instance later during the same month, however, he did not take corrective action.

## CONCLUSION

It is found and concluded that plaintiff has failed to prove by a preponderance of the evidence that it is entitled to an equitable adjustment. The Clerk of the Court shall enter judgment for defendant and dismiss the complaint.

No costs.