923 F.2d 872
 37 Cont.Cas.Fed. (CCH) 76,065
 Unpublished Disposition
NOTICE: Federal Circuit Local Rule 47.8(b) states that opinions and orders which are designated as not citable as precedent shall not be employed or cited as precedent. This does not preclude assertion of issues of claim preclusion, issue preclusion, judicial estoppel, law of the case or the like based on a decision of the Court rendered in a nonprecedential opinion or order.
CALFON CONSTRUCTION, INC., Plaintiff-Appellant,
v.
The UNITED STATES, Defendant-Appellee.
 No. 90-5033.
 United States Court of Appeals, Federal Circuit.
 Dec. 18, 1990.
Rehearing Denied Feb. 7, 1991.
 
 Before NIES, Chief Judge,* BENNETT, Senior Circuit Judge, and BREWSTER, District Judge.**
 BENNETT, Senior Circuit Judge.
 
 DECISION
 
 1
 Calfon Construction, Inc. (Calfon), appeals from the October 18, 1989 decision of the United States Claims Court entering judgment in favor of the United States on Calfon's claim under the Contract Disputes Act, 41 U.S.C. Secs. 601-613 (1988), for an equitable adjustment to its contract. 18 Cl.Ct. 426 (1989). We affirm.
 
 OPINION
 
 2
 Calfon entered into and performed a contract for paving an aircraft apron at the Fallon, Nevada, Naval Air Station. The paving included a crushed rock base, an asphalt "bond breaker," and a portland cement concrete (PCC) overlay. The contract specifications included two drawings, which were later determined to be inconsistent. One drawing showed the contours that the completed pavement would have to facilitate drainage. The other drawing showed that the thickness of the concrete layer was to be a uniform 8 inches.
 
 
 3
 After Calfon had put in the bond breaker, but before the overlying concrete was poured, it rained, and Calfon discovered areas of puddling on the asphalt. Calfon realized that if it put in a uniform 8 inches of PCC overlay, the pavement would not conform to the drawing showing the pavement contours and puddling would result. If Calfon paved to the contours shown in the first drawing, the puddling problem would be avoided, but some places would have more than 8 inches of concrete. Calfon wanted to get paid for the additional concrete.
 
 
 4
 The Navy decided to let Calfon have the option either to pave to the contours or to pour a uniform 8-inch PCC layer. As the Claims Court found, the Navy gave Calfon this option because it did not want to mandate particular conduct that would have made the Navy liable for a contract change. A letter from the contracting officer gave Calfon the option "at no change in the contract cost or time" and stated that either method of performance would be acceptable. Calfon paved to the contours, allegedly incurring about $95,000 additional costs. The Claims Court denied Calfon's claim for an equitable adjustment.
 
 
 5
 Calfon's first argument is that American Concrete Institute (ACI) standards, which were incorporated by reference in the contract specification, recommended that puddling be avoided, and failure to provide good drainage would have been a breach of Calfon's warranty agreement. Therefore, according to Calfon, the option the Navy gave was illusory. However, as the Claims Court held, the ACI standards on drainage are a design preference, and are not mandatory. The Navy's option letter explicitly stated that either paving method would be acceptable.[1] More importantly, the contract specifically provided that Calfon would not be liable for defects of designs furnished by the government. Calfon's own witnesses acknowledged that fact. The option was not illusory.
 
 
 6
 Calfon next argues that the Navy knew that Calfon was expecting an adjustment and knew that Calfon was pouring more than 8 inches of PCC overlay. Thus, according to Calfon, there was no need to respond to the Navy's letter giving Calfon the option to proceed with either paving method. The Claims Court did not clearly err in finding no agreement to allow an upward equitable adjustment. The Navy's letter explicitly stated that whatever paving method Calfon chose, there would be no cost adjustment. In view of the Navy's explicit statements in the option letter, there could have been no "meeting of the minds" on the cost increase issue, and thus no agreement can be inferred. See Porter v. United States, 496 F.2d 583, 590 (Ct.Cl.1974), cert. denied, 420 U.S. 1004 (1975). The Claims Court found that the Navy measures the amount of PCC overlay poured to determine whether the contractor is meeting the contract specifications and not cheating the government. Whether the Navy knew that more than 8 inches of PCC overlay was poured in some places is irrelevant in view of the Navy's statement that it would not pay for the additional material if Calfon chose to pave to the contours.
 
 
 7
 Calfon also argues that the government had approved a 7-inch overlay in a transitional area and acted in bad faith in not informing Calfon that a 7-inch overlay in all areas would be acceptable. This argument is without merit. The Claims Court properly found that the discussions concerning a 7-inch overlay related only to a transitional part of the apron adjacent to another apron. The Navy never approved a 7-inch overlay for the entire apron.
 
 
 8
 Because the issues on whether the option was illusory and whether the government had agreed to an upward cost adjustment are dispositive, we need not reach the issue of Calfon's failure to give notice that it was treating the option letter as a change.
 
 
 9
 NIES, Chief Judge, concurring-in-part.
 
 
 10
 I do not agree that the contractor was given a meaningful "option" either to pave to the contours as shown in drawing C-4 or to lay an even 8 inches of concrete as shown in drawing C-13. The contractor has persuaded me that an even 8 inches of concrete would have yielded an inferior product which, because of puddling problems, ran a very grave risk of rejection for poor workmanship. The apron had to drain properly. While persuaded to this view, nevertheless, I believe that the Claims Court decision on this issue should be affirmed because the contractor did not establish that its bid was based on laying an even 8 inch overlay. Evidence on this factor is referenced in the contracting officer's opinion rejecting the claim, which states "[Y]our supervisor advised him [ROICC] you had bid to meet the finish contours." Calfon points to no contrary evidence. Indeed, an assertion that Calfon bid on the basis of an 8 inch overlay without contouring would be wholly inconsistent with its position and the testimony of its witnesses that contour paving was required to meet quality standards. Further, there is no assertion here that the contractor encountered a different site condition from that which the contractor reasonably expected.
 
 
 11
 On the other issues, I join Judge Bennett's analysis and the result.
 
 
 12
 BREWSTER, District Judge, dissenting.
 
 
 13
 I respectfully dissent. Calfon did not have a viable option, and the decision of the Claims Court denying Calfon's claim for an equitable adjustment should be reversed.
 
 
 14
 To recover an equitable adjustment for work beyond that required by the contract, but without a formal change order, the contractor must show that the requirements of the contract were enlarged and that the additional work was not volunteered. Len Co. & Assoc. v. United States, 385 F.2d 438, 443, 181 Ct.Cl. 29, 38 (1967). If two alternative methods of performing are available, both options must be viable. A contractor is not a "volunteer" if the option the government provides is illusory. Southern Construction Co., Inc., ASBCA Nos. 3971, 4032, 57-2 B.C.A. (CCH) p 1563 (1957).
 
 
 15
 The Claims Court found that Calfon's option either to pave to the contours or to pour a uniform 8-inch PCC layer was not illusory. I disagree with that conclusion.
 
 
 16
 The government contracted with Calfon to provide a concrete aircraft apron that drained properly and was sufficiently thick to withstand the weight of the aircraft without cracking and spalling. Had Calfon elected the option to pave to an even 8 inches of concrete, they would have constructed an inferior product which, because of puddling problems, would have violated the work specifications requiring proper workmanship, proper drainage, and compliance with minimum standards of durability and serviceability. See American Concrete Institute Report 201, Joint Appendix to Briefs, 2046-49.
 
 
 17
 When the government sent Calfon the September 27, 1985 letter providing the option, it was aware of the puddling problems and the estimated additional cost required to contour the apron correctly. In a letter dated August 26, 1985, the subject of which included "PCC Overlay Thickness Potential Change Order," Lt. Markey estimated to his superior officer at San Bruno, California, that the additional concrete necessary to pave to the contours would be $100,000. That estimate proved to be accurate. It is apparent that the government was not surprised by the outcome of the work.
 
 
 18
 The government contends that it would have been satisfied had Calfon paved a uniform 8 inches. The evidence shows, however, that the result would have been an aircraft apron that failed to drain properly. This product would have been unacceptable. The Navy's construction representative, Patrick M. Callahan, testified that "[p]eople who build aircraft parking aprons do not like to see puddling when they're through ... Nobody likes puddles ... when we saw this on the bond breaker ... I became very nervous." Lt. Commander James R. Applegate, Lt. Markey's supervisor, testified by deposition that "what we saw there would not have been acceptable as a final surface."
 
 
 19
 The Claims Court found that Lt. Markey's September 27, 1985 letter overcomes Lt. Commander Applegate's view that the puddling would have been unacceptable. It also found that Calfon could not have been found in breach of warranty because the design defect had been provided by the government and not by Calfon. Both of these findings ignore Calfon's desire to deliver a safe and acceptable product and its valid concern about incurring potential liability.
 
 
 20
 Although the Claims Court announced that Calfon could not be liable for breach of warranty, the government could have denied providing a defective design and forced Calfon to litigate. In addition to the potential litigation costs, Calfon ran the risk of being required to remove the pavement and repave to the contours. With the knowledge that some Navy officers found puddling unacceptable, the threat of potential litigation, and the desire to do a workmanlike job, Calfon had no reasonable choice but to pave to the contours.
 
 
 21
 Although the Claims Court acknowledged that "[n]o pithy answer assures the legitimate concern of a small contractor confronting the formidable contract powers available to the government," it found that the Navy did not exhibit overreaching. I disagree. The government wanted a properly contoured apron without paying the additional $100,000. The proposed "option" forced Calfon to choose between two courses of action: (1) construct an inferior product which it knew would subject users to injury, and worse, because of flaking of frozen concrete, create the potential for cement particles to be ingested by jet engines, as well as exposing itself to potential liability for breach of contract, or (2) pave to the contours without reimbursement for the additional concrete. The government knew or should have known that Calfon had no reputable choice but to complete an acceptable product by paving to the contours.
 
 
 22
 To require Calfon to pay the additional $95,000 would result in unjust enrichment to the government. It was the government that provided the defective design plans which produced improper contour of the bond breaker, thus dooming the PCC overlay to improper contours. The government's assertion that it would have been satisfied with a uniform 8 inch paving that failed properly to drain the apron is unconvincing. The government never waived the warranty provisions. Having caused the problem, the government is forcing Calfon to absorb the expense of rectifying it.
 
 
 23
 This court should recognize the opportunity to prevent injustice to a contractor who chose the reputable course of action. To do otherwise not only rewards the malfeasor, but it potentially sends the wrong message to other contractors who would be encouraged to let professional standards be compromised. Because Calfon did not have a viable option, I would reverse the Claims Court decision denying Calfon's claims.
 
 
 
 *
 Chief Judge Nies became Chief Judge on June 27, 1990
 
 
 **
 District Judge Rudi M. Brewster of the Southern District of California, sitting by designation
 
 
 [1]
 The Claims Court found that while paving to the contours would have provided a superior product, the Navy engineers were of a different mind as to the seriousness of the deficiencies of an 8-inch overlay. The Fallon Naval Air Station is located in the Nevada desert and receives only about 5 inches of precipitation a year. The Navy was eminently capable of determining the acceptability of an 8-inch overlay that may not have met all of the ACI drainage preferences indirectly referenced in the contract specifications. The Navy could not have used more explicit terms when it told Calfon that "either paving to meet the contours shown in the plans or paving to achieve an 8" PCC overlay will meet the Contract requirements."