**LING–TEMCO–VOUGHT, INC.**

**v.**

**The UNITED STATES.**

**No. 417–69.**

United States Court of Claims.

March 16, 1973.

Harold Hoffman, Dallas, Tex., of record, for plaintiff; Wynne Jaffe & Tinsley, Washington, D. C., of counsel.

Thomas W. Petersen, Washington, D. C., with whom was Asst. Atty. Gen. Harlington Wood, Jr., for defendant.

Before COWEN, Chief Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA, KUNZIG and BENNETT, Judges.

## OPINION

DAVIS, Judge.*

Plaintiff Ling-Temco-Vought, Inc. ("LTV"), sues the defendant in this action for $1,022,973.27,[1] representing the amount which the plaintiff expended out of its own funds in completing a project that was originally undertaken by a corporation known as Frederick Fenski & Miller Electronics, Inc. ("FF & M"), under a 1961 contract between that corporation and the defendant, acting though the Bureau of Ships ("BuShips"), Department of the Navy. The suit is for breach not "under the contract."

---

* We are indebted to Trial Commissioner Mastin G. White for his opinion, the first section of which we incorporate. We reach the same port through a different channel.

1. The petition asked for a recovery in the amount of $1,110,900, but the claim was later reduced by the plaintiff to $1,022,973.27.

In the early 1960's, the Navy had a need for a large-screen display system on which could be displayed, for the benefit of the personnel in the Combat Information Center ("CIC") of a warship, data revealed by the ship's radar concerning changes in the location of moving targets (such as aircraft, missiles, and vessels on the surface of the sea). FF & M's business included the manufacture and sale of large-screen display systems for commercial applications. One of FF & M's large-screen display systems employed an electro-mechanical technique and was sold under the trade name of Iconorama. Of all the workable large-screen display systems that were in existence during the early 1960's, FF & M's Iconorama was the only one that was available for shipboard use. However, the Navy regarded the commercial-type Iconorama as incapable of keeping track adequately of the movement of the large number of high-speed targets (jet aircraft and missiles) involved in an anti-air warfare environment.

In order to study FF & M's Iconorama in a shipboard environment, and, if possible, to develop it into a satisfactory large-screen display system for CIC use aboard warships, the Navy Department (acting through BuShips): (1) purchased a commercial-type Iconorama "off the shelf" and installed it aboard the U.S.S. *Randolph* for experimentation and observation; and (2) entered into a 1961 contract with FF & M, which basically required FF & M to adapt its Iconorama to military standards and requirements, and to produce two prototypes of the system thus revised. The device which FF & M contracted to produce was to be called a Tactical/Navigational Display System ("Tac/Nav"). At the time when the contract was entered into, both contracting parties knew that the two Tac/Nav's were being purchased by the Navy for evaluation purposes.

After the contract was entered into, FF & M was acquired by and merged into LTV; and LTV, the plaintiff in the present case, was substituted for FF & M as the contractor under the contract. The effective date of this substitution was December 31, 1961.

The contract required the plaintiff to design, fabricate, test, and furnish two Tac/Nav's to the Navy, together with preliminary drawings, working drawings, preliminary technical manuals, final technical manuals, various reports, and 60 man-days of engineering services to assist in the installation and checkout of the devices. The work was to be done on a cost-plus-a-fixed-fee basis; and all work (except the furnishing of the reports and the engineering services) was to be completed by June 30, 1962.

The contract contained an estimated cost schedule in the amount of $464,753, and the fixed fee was to be $27,097. Thus, the estimated cost and the fixed fee totaled $491,850.

With respect to the estimated cost schedule, the contract contained a provision under the heading of "Limitation of Cost" which stated in part as follows:

> (b) The Government shall not be obligated to reimburse the Contractor for costs incurred in excess of the estimated cost set forth in the Schedule, and the Contractor shall not be obligated to continue performance under the contract or to incur costs in excess of the estimated cost set forth in the Schedule, unless and until the Contracting Officer shall have notified the Contractor in writing that such estimated cost has been increased and shall have specified in such notice a revised estimated cost which shall thereupon constitute the estimated cost of performance of this contract.
> * * *

At a conference between the plaintiff and BuShips that was held on March 28, 1962, the plaintiff asked that the estimated cost figure in the contract be increased by $590,000. BuShips told the plaintiff that it had not budgeted for or anticipated any cost overrun of such magnitude, and that it was not prepared

to fund such an overrun. BuShips also stated that it would like to continue the contract, but not at the cost indicated, and asked what changes could be made to reduce the projected expenses. Possible areas of cost reduction were discussed. The conference was then recessed until the next day, so that the plaintiff could recompute the estimated overrun.

On March 29, 1962, the parties conferred again. At this conference, the plaintiff made a written submission listing certain changes that could be made to reduce the proposed increase in the estimated cost of the contract from $590,000 (the figure proposed by the plaintiff on March 28, 1962) to $358,028.

By means of a telegram dated March 30, 1962, BuShips notified the plaintiff that "the contract is hereby modified to increase the total estimated cost * * * by $358,028 * * *." Modification No. 3 was signed by the contracting officer on April 18, 1962, and by the plaintiff on April 24, 1962. It increased the estimated cost of the contract by $358,028 to a new total of $822,781, and it extended the completion date (except for the furnishing of the reports and the engineering services) to August 15, 1962.

During April of 1962, the plaintiff concluded that the cost of completing the contract would exceed by some $250,000 the then-current estimated cost of $822,781. At about the end of April 1962, the plaintiff asked for a conference with BuShips; and it was held on May 3, 1962. The plaintiff's purpose in asking for a conference was to request a further increase of $250,000 in the estimated cost of the contract. At the conference, however, the conferees did not discuss the dollar amount of any additional increase in the estimated cost of the contract. Instead, the plaintiff was given what it characterized as a "stern lecture" by BuShips on overruns, and was told that BuShips would terminate the contract rather than fund or accept

an overrun. On the other hand, BuShips pointed out to the plaintiff various factors which indicated that it would be a good business risk on the part of the plaintiff if the plaintiff would complete the performance of the contract at its own expense.

The principal spokesman for BuShips at the conference on May 3, 1962, was Captain Francis H. Cunnare, the head of Code 665 in BuShips. Code 665 had entered into and was administering the contract for BuShips and the Navy Department. It was Captain Cunnare who pointed out the factors which indicated that it would be a good business risk on the part of the plaintiff if the plaintiff would complete the performance of the contract at its own expense. Captain Cunnare's representations in this respect are detailed in the findings. From the standpoint of the present litigation, the most significant of these representations will be outlined in the next two paragraphs.

Captain Cunnare told the plaintiff at the conference on May 3, 1962, that the Navy was not then considering any technique or concept other than Tac/Nav for accomplishing the large-screen display of information for CIC purposes.

Captain Cunnare also told the plaintiff that there was a "fantastic" market potential for the large-screen display system, which would justify the plaintiff in investing its own funds for the completion of the performance of the contract. In this connection, Captain Cunnare stated that the Navy had firm requirements for production quantities of a large-screen display system similar to the Tac/Nav system that was being developed by the plaintiff under the contract, that these requirements were already programmed by the Navy, and that the Navy planned to put large-screen display systems on a large number of ships. Captain Cunnare's presentation showed a requirement for the installation of large-screen display systems aboard 14 aircraft carriers over a period of approximately 5 or 6 years, an immediate requirement for 74 large-screen

display systems aboard destroyers, and a total requirement for 350 large-screen display systems aboard destroyers over a period of from 5 to 8 years.

Promptly after the conference on May 3, 1962, the plaintiff's personnel who had participated in the conference outlined Captain Cunnare's presentation to the plaintiff's top management. One of the persons who participated in the conference with BuShips and also in the conference with the plaintiff's top management was the assistant comptroller of the plaintiff. He estimated for the benefit of the plaintiff's top management, on the basis of an anticipated selling price of $150,000 per Tac/Nav per destroyer and $250,000 per Tac/Nav per aircraft carrier, that the Navy's requirements indicated sales in the amount of approximately $56,000,000 and, before taxes, a profit of approximately $5,600,000.

Another conference between the plaintiff and BuShips was held on May 8, 1962. The plaintiff's vice-president in charge of the military electronics division was in the plaintiff's group on that occasion. BuShips again told the plaintiff that it would not fund or accept an overrun; and that if overrun funds were requested, it would terminate the contract. However, BuShips also pointed out again the factors which indicated that it would be a good business risk on the part of the plaintiff if it would complete the performance of the contract at its own expense.

After these conferences, the plaintiff agreed to complete the performance of the contract with its own funds, and signed a letter to that effect under the date of May 8, 1962. This letter stated in part as follows:

＊ ＊ ＊ [T]he contractor agrees to complete the program ＊ ＊ ＊ without requesting additional overrun relief above and beyond the anticipated overrun funds of $358,028 included in ＊ ＊ ＊ Modification Number 3.

The plaintiff thereafter completed the performance of the contract. BuShips reimbursed the plaintiff for its expenditures in performing the contract, up to the amount specified in the estimated cost schedule of the contract, as revised, and paid the plaintiff the amount of the fixed fee specified in the contract, as revised. These payments fully discharged the financial obligation of BuShips to the plaintiff under the "Limitation of Cost" provision of the contract. However, the plaintiff, in completing the performance of the contract after May 8, 1962, expended $1,022,973.27 of its own funds, over and above the amount for which it received reimbursement from the Navy under the estimated cost schedule of the contract.

The Navy accepted the two Tac/Nav's that were delivered under the contract and evaluated them in a shipboard environment. In 1963, the Tac/Nav system was subjected to an evaluation testing program aboard the U.S.S. *Essex*; and the report issued subsequent to this evaluation indicated that Tac/Nav was unable to keep up satisfactorily with the large number of high-speed targets involved in an anti-air warfare ("AAW") environment. Thereafter, in order to determine whether Tac/Nav could perform satisfactorily in an anti-submarine warfare ("ASW") environment—which involves slower targets than those involved in the AAW situation—another evaluation testing program for the Tac/Nav system was performed in 1964, this one aboard the U.S.S. *Wasp*. Subsequent to the 1964 evaluation test, which was critical of the Tac/Nav system and indicated that it did not perform satisfactorily in an ASW environment, the Chief of Naval Material issued an order that no further procurements of the Tac/Nav system would be undertaken by the Navy. Therefore, the plaintiff never made any of the Tac/Nav sales which it anticipated at the time when it agreed in May 1962 to complete the performance of the contract at its own expense.

The plaintiff contends that it should be reimbursed for the $1,022,973.27 which it expended out of its own funds

in completing the performance of the contract, because it was misled by misrepresentations which were made by Captain Cunnare at the conferences on May 3 and 8, 1962.

The evidence shows that Captain Cunnare made an incorrect statement at the conferences on May 3 and 8, 1962, when he said that the Navy was not then considering any technique or concept other than Tac/Nav for accomplishing the large-screen display of information for CIC purposes. It is true that Tac/Nav was the only such system that the Navy had contracted to purchase as of May 1962. However, the record shows that Code 685—which was an organization in BuShips separate and apart from Code 665, which Captain Cunnare headed and with which the plaintiff was working under its Tac/Nav contract—had begun work in early January of 1962 on the development of a performance-type specification for a large-screen display system which would be designed for use in the CIC's of warships and which would utilize an electronic or photochromic technique, as distinguished from the scribing concept used by the plaintiff's equipment. By May 8, 1962—the date on which the plaintiff agreed to complete the performance of the Tac/Nav contract at its own expense—a substantial amount of the work on Code 685's proposed specification had been completed. Later, in April of 1963, BuShips awarded a contract to the Budd Company for the development of a large-screen display system in accordance with Code 685's specification, which had been completed in the meantime. As of February 1971, the large-screen display system developed by the Budd Company had been placed in the characteristics of two amphibious command ships by the Navy.

The evidence also shows that none of the plaintiff's personnel was aware as of May 1962 that the Navy was considering a technique different from Tac/Nav for large-screen displays to be used in CIC's aboard warships. In addition, the trial commissioner found that "the evidence warrants the inference that if the plaintiff had known as of May 8, 1962, that another group in BuShips, not under the supervision of Captain Cunnare, was working on a specification for a large-screen display system using a technique different from the scribing technique (on which the plaintiff held the necessary patents), the plaintiff would not have agreed to fund, and would not have funded, the completion of the project under the contract." [2]

The plaintiff invokes these findings of reliance and misrepresentation as the foundation of its claim that the Government improperly interfered, by misrepresenting the existing facts, with LTV's privilege under the "Limitation of Cost" clause, *supra*, to discontinue its performance when the United States refused to fund the work any further. The contention, in legal phrasing, is that the United States breached the contract by wrongfully inducing the plaintiff, through these misrepresentations, to give up an important contract right.

■ Defendant attacks the finding of reliance as unwarranted, and also challenges the characterization of defendant's conduct as "misrepresentation." However, for the purposes of the case, and without determining these issues one way or the other, we accept *arguendo* the commissioner's conclusion that plaintiff relied on Captain Cunnare's erroneous statements when it agreed to fund by itself the completion of the project. We also assume *arguendo* that these statements constituted affirmative and actionable misrepresentation. The court makes these hypothetical assumptions because we are persuaded that, even on those premises, plaintiff is barred from recovery by its own conduct after it discovered, in September 1962, the competing project which had been undertaken by Code 685.

2. Unknown to plaintiff, one of the Navy participants (other than Captain Cunnare) at the conferences on May 3 and 8, 1962, was aware at the time that Code 685 was working on the development of a specification of a display system with an electronic or photochromic technique.

On September 6, 1962, Code 685 published an advertisement in the Commerce Business Daily which plainly revealed the existence of this other project and called upon firms interested in research and development connected with such a project to make themselves and their experience known to the Navy. It was indicated that formal proposals might be requested later. The record shows that at that time—just four months after plaintiff had agreed to continue its own project with its own funds—plaintiff became quite aware that Code 685 was interested in procuring a large-screen display system utilizing an electronic or photochromic technique, and also that work along those lines was going forward.

Nevertheless, LTV did not stop work, nor did it protest to the Navy that the latter had misled plaintiff into issuing the letter of May 8, *supra*. Neither did the contractor reserve its right to bring suit or to file a claim. Apparently without any intimation to the Navy of dissatisfaction or unhappiness, LTV simply continued to the end to perform its contract and to spend its own funds on the overrun portion of the contract, knowing all the time that the Navy did not intend to reimburse it for such expenses and that the Navy thought and continued to think that the plaintiff fully agreed to that course.

More than that, plaintiff permitted the Government, after September 6th, to spend considerable federal money on this Tac/Nav contract. After May 8, both parties proceeded on the understanding that the plaintiff's undertaking to complete the agreement at its own expense extended only to the in-scope work (as modified before May 8th). Both understood that LTV's promise did not cover the contract as it might thereafter be changed. Therefore, after May 8th, whenever BuShips changed the contract by exercising options, adding out-of-scope work, or making changes in the in-scope work, it provided increased federal funds to cover the additional costs of such changes. This post-September 6th increase amounted to over $312,000, and added $2,205 to plaintiff's fixed fee. (The contract continued into 1963 and 1964, the last modification being in August 1964.) Moreover, LTV, without any suggestion that its rights had been invaded, permitted the Navy to undertake field evaluations of plaintiff's Tac/Nav system in both 1963 and 1964.

We have been given no adequate justification or explanation for this total silence, during the performance of the contract, by LTV after it learned about Code 685's project in September 1962, and knew that the representations on which it says it relies were incorrect.[3] The stark fact is that nothing was said

3. Plaintiff's main argument on this aspect of the case is that there is no evidence that, when the plaintiff learned about the Code 685 program on September 6, it also knew (or learned) that that information had been withheld from it early in May 1962—it says that, for all it knew, Code 685's project might not have been in existence in May—and therefore that plaintiff did not know in September that the Navy had made a misrepresentation four months earlier. However, Code 685's September advertisement shows on its face that the Navy had obviously been thinking for some time about that project, and we cannot believe that an easy inquiry by LTV, a very knowledgeable Navy contractor, would have failed to disclose that the other project was underway in May. If plaintiff did not actually learn this fact in September, it could and should have done so, and cannot now make a virtue of the blinders it chose to don.

Plaintiff's only other excuse for not ceasing performance in September is that, if it had done so, that would have been in breach of the post-May 8th modifications to the contract. Even if this were so, it would not excuse LTV's failure to protest and make overt reservation of its rights. But, in any event, plaintiff's legal position is incorrect; the Government's material breach would have relieved the contractor of all its obligations under the contract and permitted it to elect to claim a total breach and to end all performance. *Cf.* Northern Helex Co. v. United States, 455 F.2d 546, 550–551, 197 Ct.Cl. 118, 124–125 (1972).

until well after it became clear that the Navy would not purchase LTV's product, and no cue was given at any prior time that plaintiff thought the Government had breached its obligation under the contract. Not only was performance continued normally, but no reservation of rights was made known and the defendant was permitted to incur some $315,000 in additional costs of its own, and to pursue evaluation tests, though it might well have terminated the contract at once and stopped all performance if it had been told that plaintiff was thinking of holding it liable for all expenses after May 8.

With respect to this very type of situation we recently said: "There is, of course, venerable authority that, wherever a contract not already fully performed is continued in spite of a known breach, the wronged party cannot avail himself of that excuse * * *. As a general proposition, one side cannot continue after a material breach by the other * * *, act as if the contract remains fully in force (although stopping performance would be fair and convenient), run up damages, and then go suddenly to court." Northern Helex Co. v. United States, 455 F.2d 546, 551, 197 Ct.Cl. 118, 125–126 (1972). In Northern Helex we found "particular circumstances [centering on the need to prevent wastage of helium] justifying further performance in the specific case" 455 F.2d at 551–552, 553, 197 Ct.Cl. at 125–127, 129, but even then we rested, equally, on the significant facts that that contractor had made an express reservation of its rights when it continued performance, 455 F.2d at 552–553, 197 Ct.Cl. at 128–130, and that the "Government was not hurt and it did not change its position." 455 F.2d at 554, 197 Ct. Cl. at 130–137. The court was at pains to spell out the "special aspect" and the "special facts" of that case, 455 F.2d at 551, 553, 197 Ct.Cl. at 126, 130, which permitted the contractor to continue performance while at the same time claiming total breach. Analogous facts are not present here, as we have already pointed out and discuss again below.

An earlier decision in which a contracting party was held barred from enforcing a material breach it had for too long allowed to go unprotested is Acme Process Equip. Co. v. United States, 347 F.2d 509, 515–518, 171 Ct.Cl. 324, 334–339 (1965), rev'd on other grounds, 385 U.S. 138, 87 S.Ct. 350, 17 L.Ed.2d 249 (1966). The contractor had breached its covenant-against-contingent-fees but, said the court, "the crucial point is that the defendant, after obtaining knowledge of the facts, waited until over a year later before canceling the agreement. Could an election to cancel be delayed for such a time? We hold not. In our view, an election to annul the contract had to be made with reasonable promptness after the Government gained knowledge of the facts; by putting off its decision for an inordinately long period, the defendant lost the right it earlier had to terminate the contract without incurring any cost. * * * The sanction of contract cancellation is too drastic to permit a long delay. Beyond the time reasonably necessary to determine if there has been a misrepresentation or a violation of the covenant, the defendant cannot allow an unwary contractor to continue performance and thus incur large expenses, all of which the Government will refuse to reimburse if and when it decides to cancel the contract on the ground of the violation." 347 F.2d at 515–516, 171 Ct.Cl. at 335–336 (footnotes omitted).

The same over-all principle was applied in DeVito v. United States, 413 F.2d 1147, 1151–1154, 188 Ct.Cl. 979, 986–991 (1969), in which the Government, without any reservation of rights, permitted a defaulting contractor to continue performance for a considerable time before issuing a notice of default termination. "Where the Government elects to permit a delinquent contractor to continue performance past a due date, it surrenders its alternative and inconsistent right under the Default clause to

terminate, assuming the contractor has not abandoned performance and a reasonable time has expired for a termination notice to be given. * * * The election is sometimes express, but more often is to be inferred from the conduct of the non-defaulting party. * * * The necessary elements of an election by the non-defaulting party to waive default in delivery under a contract are (1) failure to terminate within a reasonable time after the default under circumstances indicating forbearance, and (2) reliance by the contractor on the failure to terminate and continued performance by him under the contract, with the Government's knowledge and implied or express consent." 413 F.2d at 1153–1154, 188 Ct.Cl. at 990–991.

*Acme* and *DeVito* cannot rightly be distinguished as involving an effort by the non-defaulting party to cancel, annul, or terminate the whole contract, while LTV merely seeks damages for a breach. Even on that technical formulation, this case is fully comparable. Since plaintiff seeks all of its unreimbursed costs after May 8, its claim is the exact equivalent of a demand that the contract be deemed ended as of that date. LTV wishes to be placed in the same position as if it had terminated all performance and all obligations at that time—just as the defendant unsuccessfully sought to do in *Acme* and *DeVito*.

More fundamentally, we think that plaintiff does not meet the general standard which the law has been developing for a non-defaulting party, aware of a material breach, who desires to maintain the contract alive and functioning. *Acme, DeVito, Northern Helex,* and the provisions of the Uniform Commercial Code discussed in the *Helex* opinion, are but illustrations of the basic principle calling for fair treatment of both parties—weighing the advantages to the injured side of continuing performance (with or without reservation of rights) against the disadvantages to the defaulter, and requiring that due opportunity be given the latter to make use of the options then lawfully available to him. However the legal conclusion be framed, in terms of "waiver" or "election" or "estoppel", that is the core concept.[4]

In this instance, LTV made its calculation entirely in its own favor, without proper consideration of the defendant's position. If plaintiff had stopped performance in September claiming a breach, the Navy would then know that the United States might be liable for plaintiff's costs from May 8 to that time, but it would also be free of any costs from September forward (including the $315,000 the Government itself expended thereafter). If plaintiff had continued performance but at the same time reserved its right to claim a breach, the defendant would have had the choice whether to terminate the contract entirely at that time (which it still had the right to do, *cf.* Nolan Bros., Inc. v. United States, 405 F.2d 1250, 1253–1255, 186 Ct.Cl. 602, 606–610 (1969)) or to continue at the risk of having to pay greater damages and incurring additional costs. The record suggests the probability that, if plaintiff had then uttered such a reservation, this government right to terminate would have been exercised since the Navy was adamant against funding an overrun. In any event, if the United States had been timely warned, it would have been able to make its own choice whether or not to end performance at once, and it is this choice of which the defendant was deprived.

By omitting both of these steps, the contractor in effect retained all options for itself. Not aware of the undisclosed claim of a breach, the defendant allowed the contract to continue to completion

4. There may be exceptions or qualifications for such situations, governed by countervailing factors, as payments illegally made by the Government. *See* Acme Process Equip. Co. v. United States, *supra*, 347 F.2d at 516, 171 Ct.Cl. at 336; Acme Process Equip. Co. v. United States, 347 F.2d 538, 551–553, 171 Ct.Cl. 251, 272–275 (1965).

(under the arrangement the Navy thought it had) and did not terminate. Thus, if LTV's Tac/Nav system survived the Navy's tests and the contractor sold enough of the product to the Government, plaintiff would be reimbursed for all its expenses and make a profit. It could then forget about the breach claim which would be mooted for practical purposes. On the other hand, if the product failed (as it did), the contractor would be in a position to seek reimbursement through a breach suit. The result would be to protect LTV in all eventualities, at the expense of the Government's rightful interests. It makes no difference that plaintiff may not actually have had this conscious design from September 1962 on. The patent inequity to defendant flows from LTV's overt conduct in the way it shaped events, not from any subjective bad faith. The short of it is that, whatever its intentions, plaintiff did not act reasonably and fairly toward the Government when it continued performance after early September, without giving any indication of its misrepresentation claim. For that reason we hold it precluded from recovering on that demand.[5]

■ There is an alternative claim of mutual mistake, on which little need be added. Though we assume *arguendo* a mutual mistake in May 1962 that plaintiff's Tac/Nav system was the only available and viable one, we cannot read the record as showing that, if the truth had then been known, the Navy would have agreed at the time to pay for the over-run. Government resistance to further federal funding was too strong to permit any such inference *nunc pro tunc*; the more likely result would have been termination by mutual consent in May. *Cf.* Evans Reamer & Machine Co.

v. United States, 386 F.2d 873, 879–881, 81 Ct.Cl. 539, 550–553 (1967), cert. denied, 390 U.S. 982, 88 S.Ct. 1102, 19 L. Ed.2d 1279 (1968); Southwest Welding & Mfg. Co. v. United States, 373 F.2d 982, 989–991, 179 Ct.Cl. 39, 51–54 (1967); Chernick v. United States, 372 F.2d 492, 496–497, 178 Ct.Cl. 498, 506–507 (1967). Furthermore, plaintiff's silence after September 6 militates against this reformation-rescission claim, as well as against the breach count. If the defendant had then been told that the contract was bottomed on a mistake and that LTV wished reformation or rescission, the option of immediate termination (or of rescission) would have been available to the Government and probably would have been exercised. A very large amount of government money and effort would have been saved. "We are rightly admonished, in the region of mutual mistake, to seek *just* solutions." National Presto Industries, Inc. v. United States, 338 F.2d 99, 111, 167 Ct.Cl. 749, 768 (1964), cert. denied, 380 U.S. 962, 85 S.Ct. 1105, 14 L. Ed.2d 153 (1965) (emphasis added). It is plainly inequitable to reform or rescind the agreement in 1973 at defendant's expense when plaintiff foreclosed the Navy in 1962 from freeing itself at that time from the mistaken bargain.[6]

■ The same reasons doom LTV's suggestion that it be at least awarded a *quantum meruit* recovery; there is no way to balance the detriment to the Government occasioned by plaintiff's silence after September 6th against any benefit the Navy may have obtained from plaintiff's development work under the contract. In addition, the trial commissioner found, and we agree, that this record "does not contain any evidence on the basis of which the value which the Navy

---

5. In the circumstances it would not be proper to allow plaintiff's claim even if shaved down to the costs incurred between May 8, and September 6, 1962. Because of the contractor's conduct, the defendant incurred very substantial expenses after the latter date and undertook the test evaluations. If plaintiff had alerted the

Navy on time, the Government might have chosen to expend that money and effort in other, more productive, ways. There is no practicable method of assessing the net gains and losses. *See also infra.*

6. *See* note 5, *supra.*

derived from the plaintiff's developmental work under the contract could be expressed in financial terms." *Cf.* Boyajian v. United States, 423 F.2d 1231, 1244, 191 Ct.Cl. 233, 254 (1970).

The plaintiff is not entitled to recover and its petition is dismissed.