**Mahmoued (Michael) R. ZOUBI and Ibtisam Y. Zoubi, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

No. 91–958C.

United States Claims Court.

March 25, 1992.

---

Kathleen L. Caldwell, Memphis, Tenn., attorney of record for plaintiff. Taylor, Halliburton, Ledbetter & Caldwell, of counsel.

Kathryn A. Bleecker, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for defendant. David M. Cohen, Director, Martha H. DeGraff, Asst. Director, and Art Rettinger, Customs Service, Dept. of the Treasury, of counsel.

## OPINION

FUTEY, Judge.

This government contract case is before the court on defendant's motion to dismiss plaintiffs' amended complaint for failure to state a claim upon which relief can be granted or, in the alternative, on motion for summary judgment. Plaintiffs, Mahmoued R. Zoubi (Mr. Zoubi) and Ibtisam Zoubi (Ms. Zoubi), provided the United States Customs Service (CS) interpreter services and seek compensation for the breach of their contracts, which, plaintiffs allege, were with the CS. Defendant asserts that plaintiffs were never under contract with the CS, but instead worked under a contractual ar-

rangement with the Office of Language Services (OLS) of the United States Department of State (State Department). Moreover, defendant contends that plaintiffs' breach of contract claims are legally insufficient.

*Factual Background*

 Plaintiff, Mahmoued Zoubi, was certified as a Saudi Arabian translator and interpreter by the OLS of the State Department. After certification, he executed a basic ordering agreement (BOA) with the State Department on April 1, 1979. Some time later, plaintiff, Ibtisam Zoubi, was also certified, and a BOA was drawn up but never executed; nonetheless, defendant concedes that Ms. Zoubi performed services under a BOA with the State Department. The BOAs set the terms of plaintiffs' prospective employment and provided that the OLS could order services by issuing work orders.[1]

Plaintiffs became associated with the CS in September 1981, as the CS needed Saudi Arabian interpreters. The CS had needed interpreters since June 22, 1978, when the United States Department of Treasury and the Saudi Arabian Ministry of Finance and National Economy entered into an agreement establishing a joint program to train Saudi Arabian Customs personnel. According to the agreement, the two government entities were to work together to provide training facilities and instruction in both countries. Further, the Saudi Arabian government agreed to finance the program in full.

Pursuant to the agreement, the CS had established the Saudi Arabian Project at Memphis State University (MSU) in Memphis, Tennessee. According to defendant,

the CS and the OLS entered into a series of interagency agreements under which the OLS provided the CS interpreters. In exchange, the CS agreed to reimburse the OLS for the interpreters' services.

In September 1981, the OLS referred plaintiffs to the CS for employment as interpreters on the Saudi Arabian Project. The CS provided each plaintiff a travel authorization, dated September 28, 1981, authorizing payment of expenses and a per diem of $61.00 from October 1, 1981 until November 1, 1981. The authorization was provided to defray plaintiffs' costs in moving from Washington, D.C., to Memphis.

While employed at MSU, plaintiffs were paid a daily rate established by their BOAs. Plaintiffs received payment for their services from the State Department. However, they received payment of per diem directly from the CS.

In early 1982, the Saudi Arabian Project was moved from MSU to Arkansas State University (ASU) in Jonesboro, Arkansas. Mr. Zoubi alleges at this time he was receiving a daily pay rate of $173.00, plus per diem of $61.00. He maintains that while at ASU he continued to be paid at the daily rate, but received only $50.00 per diem.

Near the time the project was moved to ASU, Mr. Zoubi received a memorandum dated March 16, 1982, from Robert J. Ruth, "Acting Program Director, Saudi Arabian Program Arkansas State University" (Ruth memorandum). In this memorandum, Ruth "offered" Mr. Zoubi "the assignment of full-time interpreter with the U.S. Customs Service Saudi Arabian Project at Arkansas State University at Jonesboro, AR, as long as this program and its associated interpreting needs continue at its present level of effort." Ruth also advised Mr.

---

1. The basic ordering agreement (BOA), itself, was not a contract. A contract arose only when the contractor accepted a work order issued by the Office of Language Services (OLS). *See Modern Sys. Technology Corp. v. United States,* 24 Cl.Ct. 360, 363 (1991). The work order authorized the contractor to perform various services and provided that payment would be made in accordance with the schedule of rates in the BOA. The contract arising on acceptance of a work order could be enforced only to the extent the services had actually been performed. *See*

*Bel Pre Health Care Ctr., Inc. v. United States,* 24 Cl.Ct. 495, 497 (1991). To receive payment under the BOA, the contractor had to submit an invoice to a United States Department of State (State Department) contracting officer (CO), who would approve (or disapprove) the requested payment. Payment was received directly from the State Department. *See generally,* 41 C.F.R. § 1–3.410–3 (1984) (regulation controlling the use of BOAs in 1984); *see also,* 48 C.F.R. § 16.703 (1991) (current regulation controlling the use of BOAs).

Zoubi that he would receive a flexible rate of pay and set a date on which the assignment would commence. In addition, the memorandum set forth several conditions for continued employment on the project. First, Mr. Zoubi had to move his residence from Memphis to Jonesboro at his own expense. Further, per diem would be authorized only for 30 days after receipt of the memorandum.

Ruth concluded by instructing Mr. Zoubi to sign the memorandum above a line that provided: "I acknowledge receipt of this notice and accept assignment to Arkansas State University at Jonesboro, Arkansas." After signing, Mr. Zoubi was to return the memorandum to Ruth. Attached to the memorandum was a "Policy Statement" which reiterated the information contained in the memorandum. Mr. Zoubi signed the memorandum and dated it March 15, 1982.[2]

Ms. Zoubi has not alleged that she received or signed a similar memorandum, and there is no evidence in the record of any such memorandum being directed to her. However, on March 11, 1982, she did receive a memorandum establishing local procedures for interpreters at ASU. Attached to this memorandum was the same policy statement that was attached to the Ruth memorandum.

On June 15, 1982, Ms. Zoubi received a memorandum from Ruth informing her that as of July 1, 1982, her services would be suspended until needed again. After receiving this memorandum, Ms. Zoubi was never offered further employment. According to records supplied by defendant, in the fall of 1982, Ms. Zoubi accepted employment with ASU, where she continued to work until resigning in February 1985.

In a memorandum dated January 3, 1985, Ruth informed Mr. Zoubi that as of February 1, 1985, his services would be terminated. In a letter of January 17, 1985, Mr. Zoubi thanked Paul Kavanaugh of the OLS

for providing him the opportunity to work on the Saudi Arabian Project and requested that his name be kept in the active file for future assignments.

By letter dated November 7, 1987, plaintiffs filed a joint claim pursuant to the Contract Disputes Act of 1978 (CDA), 41 U.S.C. § 605(a), with the State Department, alleging that the CS had breached their employment contracts. In a written reply of December 22, 1987, Harry Obst, Director of Language Services, State Department, informed plaintiffs that their claim should be directed to the CS. Obst acknowledged that plaintiffs were under contract with the OLS during the years at issue, but stated further that CS officials had performed all the procurement and hiring activities alleged in plaintiffs' claim. Obst added that these activities took place without any knowledge or endorsement by the OLS. Obst asserted that from time to time his office did furnish the CS contract interpreters on a reimbursable basis. In the next sentence, however, Obst stated "[o]f course, any other agency would be able to offer independent contractors their own contractual arrangements or employment according to their own procurement and hiring authority."

Thereafter, plaintiffs filed a joint claim with a CS Contracting Officer (CO) who in a final decision dated February 21, 1990, denied their claim. The CO found that Mr. Zoubi's termination was proper under either the Ruth memorandum or the State Department BOA, and that Ms. Zoubi had voluntarily transferred to employment with ASU.[3]

On February 25, 1991, plaintiffs filed a complaint in this court pursuant to the Tucker Act, 28 U.S.C. § 1491. In their complaint, plaintiffs allege that the CS breached their employment contracts and seek compensation in the amount of $536,200.00. As the basis for their claim, plaintiffs aver that the CS wrongfully terminat-

---

**2.** The memorandum was dated March 16, 1982; however, Mr. Zoubi dated his signature March 15, 1982. The evidence does not indicate the basis for this discrepancy.

**3.** Under the BOAs, the State Department could terminate plaintiffs' services on 30 days written notice or for the convenience of the government. In addition, termination could be effected simply by ceasing to issue work orders.

ed their employment contracts and, in addition, improperly reduced Mr. Zoubi's rate of pay.

On May 10, 1991, defendant filed a motion to dismiss, or, in the alternative, for summary judgment. Defendant contended that the court should dismiss the complaint for lack of jurisdiction as plaintiffs had failed to identify any statute or regulation mandating a monetary recovery against the government. Defendant also maintains that the complaint should be dismissed for failure to state a claim upon which relief can be granted, alleging that Mr. Zoubi was never under contract with the CS, but instead worked under a series of BOAs with the State Department. Since Mr. Zoubi's services were terminated in accordance with the BOAs, he cannot establish a breach of contract. As for Ms. Zoubi, defendant avers that she failed to allege that she had an enforceable contract with the government, and, even if such a contract did exist, Ms. Zoubi was properly terminated for the convenience of the government. Finally, defendant claims that should the court find the existence of a contract between Mr. Zoubi and the CS, summary judgment is nevertheless appropriate as the undisputed facts indicate that the CS fulfilled every contractual obligation it may have owed Mr. Zoubi.

On July 12, 1991, plaintiffs filed an amended complaint citing the CDA, 41 U.S.C. § 609(a)(1), and the Tucker Act, 28 U.S.C. § 1491, as the basis for jurisdiction. In response to defendant's motion, plaintiffs aver that the Ruth memorandum constituted a contract between Mr. Zoubi and the CS. Plaintiffs claim that the CS breached that contract by unilaterally reducing Mr. Zoubi's rate of pay and by wrongfully terminating his services. Plaintiffs further allege that Ms. Zoubi had a contract with the CS, which was breached when the CS wrongfully terminated her services.

■ In its reply of September 30, 1991, defendant withdrew the motion to dismiss for lack of jurisdiction, since plaintiffs had identified a money mandating statute in their amended complaint.[4] However, defendant continued to pursue its other motions. The court heard oral argument on February 17, 1992.

## Discussion

### I.

To sustain a claim under the CDA, each plaintiff must establish an express or implied contract with the CS. 41 U.S.C. § 602(a). If either plaintiff was under contract only with the State Department, the court lacks jurisdiction over that plaintiff's claim, since the claim has not been submitted to a State Department CO for a final decision.[5] 41 U.S.C. § 605(a); *Dawco Constr., Inc. v. United States*, 930 F.2d 872, 877 (Fed.Cir.1991).

### A. *Mr. Zoubi's claim*

■ At issue is whether an agency procuring services from another agency is contractually bound by an agreement entered into directly with the service contractor. Mr. Zoubi alleges that the Ruth memorandum constituted an express contract with the CS. Defendant counters that the memorandum was only an offer of the assignment as a full-time interpreter with the Saudi Arabian Project at ASU. To establish a binding express contract, Mr. Zoubi must show mutuality of intent to contract, offer and acceptance, consideration, and that the government official whose conduct is relied on had actual authority to bind the government in contract. *Clean Giant, Inc. v. United States*, 19 Cl.Ct. 390, 393 (1990).

### 1. Existence of a contract

Defendant contends that Mr. Zoubi was never under contract with the CS, but was

---

4. Although defendant withdrew its motion to dismiss for lack of jurisdiction, this court is obligated to determine its own jurisdiction. *Hambsch v. United States*, 857 F.2d 763, 764–65 (Fed.Cir.1988), *cert. denied*, 490 U.S. 1054, 109 S.Ct. 1969, 104 L.Ed.2d 437 (1989).

5. Plaintiffs originally submitted a joint claim to the State Department for a final decision; they withdrew the claim after the OLS instructed them to submit their claim to the CS.

under contract only with the State Department. Defendant notes that throughout his service with the Saudi Arabian Project, Mr. Zoubi submitted invoices to the State Department from which he received payment for his services. Plaintiff counters that the Ruth memorandum superseded the State Department BOAs and work orders, and that the State Department, in effect, acted only as the agent of the CS.

The Ruth memorandum did not alter the contractual arrangement between Mr. Zoubi and the State Department, nor did it supersede that arrangement. The memorandum did not manifest an intent on the CS's behalf to undertake the obligation of paying Mr. Zoubi directly. In addition, in his affidavit Mr. Zoubi acknowledges that throughout his service with the CS, invoices were submitted to the State Department from which payment was received. Thus, the State Department retained its rights under the BOA, as did Mr. Zoubi.

Further, the relationship between the State Department and the CS cannot be characterized as that of principal and agent so that the CS is directly liable to Mr. Zoubi. "Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." *Restatement (Second) of Agency* § 1(1) (1958). In this case, the State Department only supplied the CS interpreters pursuant to an interagency agreement. There is no evidence of any conduct between the two parties indicating that the State Department consented to act under the control of the CS or as a fiduciary of the CS. *Id.* §§ 12–14. Accordingly, the State Department never acted as the CS's agent in the CS's dealings with Mr. Zoubi.

The Ruth memorandum, however, was not a nullity, as defendant contends. Instead, the execution of the memorandum created an express contract separate from the contractual arrangement between Mr. Zoubi and the State Department.[6] First, the Ruth memorandum reveals mutuality of intent to contract, and offer and acceptance. In the memorandum, Ruth uses language of offer and invites acceptance by signing and returning the memorandum. Mr. Zoubi's signature is affixed to the memorandum in the place designated by Ruth, and defendant concedes that Mr. Zoubi returned the memorandum.

Defendant protests that the memorandum was only an offer of an assignment. Defendant's protestation would have merit if the memorandum purported only to offer Mr. Zoubi the position of interpreter. The memorandum, however, did much more. It provided a limited guarantee of employment while conditioning employment on the acceptance of the terms in the memorandum.

These objective manifestations of contractual intent are supported by the parties' subjective understandings. In his declarations, Ruth explained that the Ruth memorandum "indicated Customs intent that Mr. Zoubi would be used on a full-time basis with the program as long as the program and its associated interpreting needs continued at their present level of effort."[7] Similarly, Ruth declared that "[t]here was never any intent to employ him [Mr. Zoubi] forever, but on the contrary, to offer him a full time position only so long as the workload and effort re-

---

6. At oral argument, the court asked counsel for defendant whether the United States Customs Service (CS) could have modified Mr. Zoubi's employment agreement with the OSL. Defendant's counsel responded as follows:

> It [the CS] could not, as I've said before, modify the terms of the basic ordering agreement.... I would think that they could modify some of the conditions of employment that were not otherwise covered by the basic ordering agreement, like the time of work and matters such as that.

Transcript of Oral Argument, p. 27. Thus, defendant concedes that the parties could enter into a separate contract as long as their agreement did not conflict with the State Department BOA.

7. Declaration of Robert J. Ruth, ¶ 10; *see also id.,* ¶ 9 (stating that "Customs offered these individuals the opportunity to work on a full-time basis at ASU at what was the rate set by the Department of State, Language Services Division, for interpreters employed on a daily basis").

mained at the original level."[8] Mr. Zoubi also interpreted the Ruth memorandum as indicating an intent to contract.[9]

The Ruth memorandum is also supported by consideration in the form of the parties' return promises. The CS promised to obtain Mr. Zoubi's services "as long as this project and its associated interpreting needs continue at their present level." Under the interagency agreement between the CS and the State Department, the CS was not required to employ Mr. Zoubi for any length of time and could terminate his services at any time. On executing the Ruth memorandum, the CS gave up this prerogative. Thus, by agreeing to forebear from exercising a legal power, the CS supplied consideration sufficient to support a contract. 1 A.L. Corbin, *Corbin on Contracts* § 136 (1963).

Consideration on Mr. Zoubi's part is provided by his promise to relocate to Jonesboro, Arkansas, and thereby give up per diem. Under the terms of the BOA, Mr. Zoubi was not required to relocate his permanent residence, which was specified in the BOA, and when away from his permanent residence, he was entitled to per diem.[10] At the time the Ruth memorandum was executed, Mr. Zoubi's BOA listed his permanent residence as being in Alexandria, Virginia. Thus, Mr. Zoubi was entitled to per diem.[11] On executing the Ruth memorandum, Mr. Zoubi not only agreed to relocate his permanent residence to Jonesboro, but, in so doing, also gave up his contractual right to receive per diem while providing services for the Saudi Arabian Project.

■ At first glance, any promises the parties made to each other may seem illuso-

ry, as the State Department could nullify their contractual undertaking by terminating Mr. Zoubi's services. This power in the State Department, however, did not abrogate the parties' agreement, but only limited it. *See Corbin on Contracts* § 148; *Restatement (Second) of Contracts* § 76 cmt. c (1981). Thus, as long as a valid BOA was in effect, the CS owed Mr. Zoubi the contractual obligations set forth in the Ruth memorandum.

### 2. Ruth's authority

■ Defendant avers that Ruth was not a CO for the CS and, therefore, lacked authority to enter into a contract on the CS's behalf. However, a procuring agency's CO is not the only person capable of binding the agency in contract. "Authority to bind the [g]overnment is generally implied when such authority is considered to be an integral part of the duties assigned to a [g]overnment employee." *H. Landau & Co. v. United States*, 886 F.2d 322, 324 (Fed.Cir.1989) (*quoting* J. Cibinic, Jr., & R. Nash, Jr., *Formation of Government Contracts* 43 (1982)). Thus, the nature of the duties assigned to Ruth must be examined to determine whether Ruth had the implied authority to bind the CS to the Ruth memorandum.

At the time Ruth offered Mr. Zoubi the interpreter assignment, Ruth was "Acting Program Director" of the Saudi Arabian Project. At that time he was engaged in abolishing the training project at MSU and establishing a new project at ASU. Implicit in this undertaking was the authority to obtain the personnel necessary for establishing the project.[12] As part of his duties,

---

**8.** Supplemental Declaration of Robert J. Ruth, ¶ 2.

**9.** *See* Affidavit of Plaintiff, Mahmoued (Michael) R. Zoubi, ¶¶ 4, 6.

**10.** See Article 5 of Additional Terms and Conditions of the BOA.

**11.** While at MSU, Mr. Zoubi had received per diem directly from the CS. Although there is no evidence that the CS was contractually bound to pay per diem directly, it had agreed to reimburse the State Department for its expenses un-

der the BOAs. Thus, if the State Department paid the interpreters per diem, the CS had to reimburse the State Department for its expenditure.

**12.** At oral argument, counsel for defendant stated as follows:

He [Ruth] had authority to offer them [the interpreters] an assignment with the program, which he did. So to an extent that's a hiring situation. But again, this is an assignment based on the referral from the State Department.

Transcript of Oral Argument, p. 25.

he obtained interpreters through the State Department. The CS, however, wanted to avoid paying per diem to the interpreters. Thus, as an incentive to induce interpreters to relocate to Jonesboro and thereby give up their per diem, the CS offered the interpreters "the opportunity to work on a full-time basis at ASU at what was the rate set by Department of State, Language Services Division, for interpreters employed on a daily basis." [13] As the acting project director, Ruth executed the decision to offer the interpreters this inducement to relocate. In these circumstances, Ruth had the implied authority to bind the CS in contract.

This conclusion is supported by defendant's understanding of the scope of Ruth's authority. At oral argument, the court inquired into Ruth's authority and received the following response:

> The Court: .... What was his actual authority as director of the Saudi Arabian program? What were his responsibilities? Did he ever direct the use of the Saudi Arabian Government's funds?
>
> Ms. Bleeker: Yes, to the extent that it was covered by the agreement between the Saudi Arabian Government and the Customs Service. To my knowledge, he certainly never went beyond any agreement between the parties or between agencies.[14]

Under the agreement between the CS and the Saudi Arabian government, the CS was required to establish training programs. Hence, defendant agrees that Ruth had authority to direct the Saudi Arabian government's funds to the extent necessary to meet this requirement.

Thus, a contract existed between the CS and Mr. Zoubi. Accordingly, the court has jurisdiction over Mr. Zoubi's claim.

### B. *Ms. Zoubi's claim*

■ Ms. Zoubi has failed to establish a contract with the CS. Ms. Zoubi has failed to produce any document that could be construed as an express contract between her and the CS. In the complaint, Ms.

Zoubi claims that she and Mr. Zoubi were hired as a "husband and wife" team. To support her claim, Ms. Zoubi points to a series of memoranda from Ruth that delineate her duties. None of the memoranda, however, contain any language of offer, invite an acceptance, or otherwise reveal an intent to contract.

Ms. Zoubi has also failed to allege any facts from which an implied-in-fact contract with the CS can be inferred. "Before a contract may be implied-in-fact, there must be a meeting of the minds which is inferred from the conduct of the parties, and in the light of the surrounding circumstances, shows their tacit understanding." *Somali Dev. Bank v. United States*, 205 Ct.Cl. 741, 751, 508 F.2d 817, 822 (1974). The undisputed facts indicate that until her termination in June 1982, Ms. Zoubi worked as an interpreter under a contractual arrangement with the State Department. Under this arrangement, she submitted invoices to the State Department from which she received payment. Thus, an express contract existed with the State Department. Further, this contract covered the same subject matter as the alleged employment contract with the CS. This factual predicate is inconsistent with the existence of an implied-in-fact contract with the CS. *E.g., Atlas Corp. v. United States*, 895 F.2d 745, 754–55 (Fed.Cir.), *cert. denied*, — U.S. —, 111 S.Ct. 46, 112 L.Ed.2d 22 (1990). Finally, Ms. Zoubi does not allege that an implied-in-fact contract with the CS arose after her termination. Thus, an implied-in-fact contract has not been established.

In short, there is no evidence of an express or implied-in-fact contract between Ms. Zoubi and the CS. Accordingly, the court lacks jurisdiction over Ms. Zoubi's claim.

### II.

Having established a contract with the CS, Mr. Zoubi has standing under the CDA to assert his breach of contract claims against the CS. *See* 41 U.S.C. § 602(a).

---

**13.** Declaration of Robert J. Ruth, ¶ 9.

**14.** Transcript of Oral Argument, p. 24.

Mr. Zoubi bases his breach claims on two allegations. First, he alleges that the CS breached his contract by unilaterally reducing his pay rate. In addition, Mr. Zoubi asserts that he was wrongfully terminated.

## A. *Summary judgment*

Summary judgment is an integral part of the federal rules; it is designed "to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986) (quoting Fed. R.Civ.P. 1). Summary judgment is appropriate when the pleadings raise no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. RUSCC 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986). The moving party bears the burden of establishing an absence of evidence to support the non-movant's case. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). The party opposing summary judgment has the burden of showing sufficient evidence, not necessarily admissible, of a genuine issue of material fact in dispute. *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. at 2553 (1986). Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163 (Fed.Cir.1985), to whom the benefit of all presumptions and inferences runs. *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed.Cir. 1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

To grant summary judgment in the present case, the court must determine, as a matter of law, whether the CS promised to pay Mr. Zoubi at certain pay rates and whether, under undisputed material facts, Mr. Zoubi was terminated in accordance with the employment guarantee in the Ruth memorandum. The court is presented with questions of contract interpreta-

tion. The court may rule on those interpretations as a matter of law. *National Rural Utils. Coop. Fin. Corp. v. United States*, 14 Cl.Ct. 130 (1988), *aff'd*, 867 F.2d 1393 (Fed.Cir.1989).

## B. *Reduction in pay rate*

■ Mr. Zoubi contends that as of July 1983, the CS unilaterally reduced his pay rate from $180.00 per day to $130.00 per day. Defendant counters that the work orders set the rates received by Mr. Zoubi, and, therefore, summary judgment is appropriate.[15] In support of his contention, Mr. Zoubi relies on the following paragraph from the Ruth memorandum:

> You are also advised that your rate of pay will be at your highest certified rate while the Short Term Training Classes are in session, but will be at the "escort duty" rate of pay during those periods when Short Term Training Classes are not in session.

This paragraph is insufficient to establish a contractual obligation to pay Mr. Zoubi at certain rates. First, the paragraph does not evidence an intent by the CS to pay Mr. Zoubi directly. Before the Ruth memorandum was executed, Mr. Zoubi was under contract with the State Department from which he received payment for his services with the Saudi Arabian Project. The paragraph, however, makes no mention of altering the existing contractual chain. Therefore, the paragraph cannot be interpreted as manifesting the CS's intent to assume the payment obligations of the State Department.

Admittedly, there is evidence suggesting that the CS had ultimate control over the pay rates received by Mr. Zoubi from the State Department. However, the above paragraph, on its face, does not reveal an intent by the CS to exercise its authority to ensure that Mr. Zoubi received the above pay rates from the State Department. The paragraph contains no language of promise or guarantee; nor does it contain any lan-

---

**15.** Defendant contends that this claim should be dismissed for failure to state a claim upon which relief can be granted. However, since defendant's motion to dismiss was filed with additional documents, it is treated as a motion for summary judgment under RUSCC 56. *See* RUSCC 12(b).

guage indicating that the CS intended to bargain for Mr. Zoubi's performance in exchange for payment at the above rates. Similarly, the paragraph in which the offer of assignment of a full-time interpreter is made fails to reference the pay rates as an inducement to contract. Thus, the above paragraph is more properly interpreted as only informing, or "advising," Mr. Zoubi as to his anticipated pay rates.

This interpretation is supported by the conduct of the parties. "A principle of contract interpretation is that the contract must be interpreted in accordance with the parties' understanding as shown by their conduct before the controversy." *Julius Goldman's Egg City v. United States*, 697 F.2d 1051, 1058 (Fed.Cir.), *cert. denied*, 464 U.S. 814, 104 S.Ct. 68, 78 L.Ed.2d 83 (1983). Throughout Mr. Zoubi's service with the Saudi Arabian Project, the State Department issued BOAs setting pay rates and work orders incorporating those rates. In accordance with the terms of the BOAs, Mr. Zoubi looked to the State Department for payment; he never received payment for his services directly from the CS. Further, there is no evidence that Mr. Zoubi complained to the CS when it allegedly reduced his pay rate. In fact, he continued to perform services despite the pay reduction. Mr. Zoubi's silence and continued service manifested his understanding that the above paragraph did not impose a contractual duty on the CS. *Id.* Therefore, under the facts peculiar to the present case, Mr. Zoubi lacks any basis for claiming that the CS wrongfully reduced his pay rate.

■ Moreover, assuming *arguendo* that the CS guaranteed Mr. Zoubi certain pay rates, defendant's alternative motion for summary judgment should be granted.[16] Mr. Zoubi has failed to provide any evidence that he objected to the pay reduction at any time prior to filing his claim before the State Department CO in November 1987, over 4 years after the alleged improp-

er reduction first occurred. Instead, the evidence indicates that he acquiesced to the reduction.[17] In these circumstances, Mr. Zoubi is estopped to assert his breach claim even if the pay reduction was not supported by consideration:

> When a party with knowledge or the means of knowledge of his rights and of the material facts does what amounts to a recognition of the transaction as existing, or acts in a manner inconsistent with its repudiation, or permits the other party to deal with the subject matter under the belief that the transaction has been recognized, or abstains for a considerable length of time from impeaching it, so that the other is reasonably induced to suppose that it is recognized, there is acquiescence, and the transaction, though it be originally impeachable, becomes unimpeachable. [Citations omitted.]

*Harvey Radio Labs., Inc. v. United States*, 126 Ct.Cl. 383, 391–92, 115 F.Supp. 444, 449 (1953), *cert. denied*, 346 U.S. 937, 74 S.Ct. 377, 98 L.Ed. 425 (1954); *accord Ling-Temco–Vought, Inc. v. United States*, 201 Ct.Cl. 135, 146, 475 F.2d 630, 637 (1973); *cf. Union Pac. R.R. Co. v. United States*, 847 F.2d 1567, 1570 (Fed.Cir.1988) (*quoting Harvey Radio Labs., supra*, approvingly in determining whether a taxpayer was estopped to question the validity of an agreement with the government). Accordingly, Mr. Zoubi's claim is legally insufficient.

C. *Wrongful termination*

■ Mr. Zoubi claims that he was wrongfully terminated while defendant contends that Mr. Zoubi's termination was proper. The employment guarantee in the Ruth memorandum provides as follows:

> In accordance with the provisions of the attached Policy Statement: Interpretation, you are hereby offered the assignment of full-time interpreter with the U.S. Customs Service Saudi Arabian Project at Arkansas State University at Jonesboro, AR, *as long as this program*

---

16. As the relevant facts are undisputed, summary judgment is appropriate. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 246, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986).

17. *See* Exhibit 3 to Affidavit of Plaintiff, Mahmoued (Michael) Zoubi.

*and its associated interpreting needs continue at its present level of effort.* [Emphasis added.]

The parties' dispute centers on how to measure the "present level of effort." Mr. Zoubi links the phrase to the number of Saudi Arabians attending the project. He avers that the number of students attending the project was the same when he was terminated in February 1985, as the number attending the project in March 1982. According to Mr. Zoubi, the CS replaced full-time interpreters with temporary interpreters to fulfill the project's interpreting needs. This substitution, Mr. Zoubi alleges, violated his employment guarantee.

Defendant counters that as a result of several policy changes the project's interpreting needs had been significantly reduced. Thus, defendant links the phrase "present level of effort" directly to the level of need for interpreters.

The court agrees with defendant's interpretation. The plain language of the guarantee indicates that employment was guaranteed only for as long as the project's interpreting needs continued at the present level of effort. Mr. Zoubi assumes that, since the number of Saudi Arabian students attending the project remained at roughly the same levels, the associated interpreting needs also remained at the same levels. Such is not necessarily the case. The policy changes could have legitimately reduced the need for interpreters. Thus, the issue is whether after implementing the policy change, the need for interpreters was, in fact, reduced.

In his declarations, Ruth discussed the policy changes. According to Ruth, as of 1985, Saudi Arabian students were required to complete an intensive program in English in Saudi Arabia before attending ASU. In addition, the CS and Saudi Arabian Customs personnel had decided that the Saudi Arabian students would gain a greater proficiency in English and generally be more self-reliant if they were not provided interpreter services after school hours. Ruth further asserts that, as of 1985, the original Saudi Arabian graduate students no longer needed interpreter services as they were adequately proficient in English. Finally, as a result of funding and recruiting problems, the overall scale of the Saudi Arabian Project was to be reduced beginning in 1985. Based on these considerations, Ruth avers, the CS no longer needed Mr. Zoubi's services.

Mr. Zoubi does not provide any evidence to the contrary. However, he does quote his termination letter as evidence that the project continued to utilize the services of interpreters. In that letter, Ruth states in relevant part as follows:

This is to advise you that as a result of a management decision made during the Office of Saudi Arabian Programs Program Review Conference recently held at Marrakesh, it has been decided to terminate our permanent interpreter positions at Arkansas State University (ASU), and *to solely use temporary interpreters as needed to meet specific program requirements.* [Emphasis added.]

Thus, Mr. Zoubi maintains that, since the project continued to use interpreters, his termination was wrongful.

This excerpt from Mr. Zoubi's termination letter does not indicate that the project's interpreting needs were the same in February 1985, as in March 1982. As a result of the policy changes, full-time interpreters were no longer needed or even desirable. The excerpt reveals that because of the policy changes, any need for interpreters could be fulfilled by temporary interpreters employed on a short-term basis "solely ... as needed to meet specific program requirements." Thus, the project's interpreting needs had not continued at the present level of effort, but had shifted. The need for full-time interpreters had been eliminated while any requirements for interpreting services had diminished. In these circumstances, Mr. Zoubi was not wrongfully terminated. He was kept on until the project could no longer justify his full-time services. In fact, Mr. Zoubi was the last full-time interpreter terminated. Mr. Zoubi's breach claim is, therefore, insufficient as a matter of law.

### Conclusion

For the above reasons, defendant's motion to dismiss Ms. Zoubi's claim is granted for lack of subject matter jurisdiction. Further, defendant's motion for summary judgment on Mr. Zoubi's claim is granted. Accordingly, the Clerk is directed to dismiss the complaint.[18] No costs.

---

**18.** All claims against the CS shall be dismissed with prejudice. Claims against the State Department, if any, shall be dismissed without prejudice.